# Clara S. Blood, Exrx. of A. R. Blood, Appellant, *v.* Erie Dime Savings & Loan Co.

*Conversion of collateral security—Sale—Fraud—Damages.*

A creditor who sells collateral deposited to secure his debt, after refusing to accept the amount of his debt and surrender the collateral, because the debtor declined to pay another debt to another person, for which the collateral was not pledged, is guilty of an unlawful conversion of the property, and the measure of damages is the real value of the collateral at the time of the sale.

In such a case the fact that, immediately prior to the sale, the creditor offers to accept the amount of his own debt, does not make the sale valid, reasonable time not being granted the debtor within which to comply with the offer.

*Equity—Jurisdiction—Sale of collateral.*

In the above case the creditor bought the collateral at the sale, and sold it after a bill was filed to compel reconveyance. *Held,* that a court of equity had jurisdiction to enter a decree for damages against the creditor for the conversion of the collateral.

Argued April 26, 1894. Appeal, No. 499, Jan. T., 1894, by plaintiff, from decree of C. P. Erie Co., May T., 1892, No. 7, dismissing bill in equity. Before STERRETT, C. J., GREEN, MITCHELL, DEAN and FELL, JJ. Reversed.

Bill in equity to compel reconveyance of stock alleged to have been wrongfully converted by defendant.

The case was referred to T. A. Lamb, Esq., as master. His findings of fact and law are stated in the opinion of the Supreme Court. His reasons in support of his conclusions of law were in part as follows:

"The fifth conclusion of law seems to the master self-evident. The parties had agreed that the $8,000 should be paid on or about April 1, 1892. By the very terms of the contract, therefore, the time was indefinite, and hence could not be material. It was known to both parties that the fund in question was to come from James McDade, and that the time of its payment would depend on carrying out the agreement for the dissolution of the Carbon Mfg. Co., which time could not be certainly known. The debt bore interest, and it would fully

compensate the delay, without subjecting the plaintiff to the loss of the $30,000 paid, by way of a penalty.

" The master's reasons for finding that the defendant was responsible for the plaintiff's failure to pay the $8,000, and his sixth conclusion of law are as follows :

" The Carbon Mfg. Co., Ltd., was organized under the Limited Partnership Act of June 2, 1874. The defendant held A. R. Blood's stock in that company as collateral security. As holder of the stock, the defendant is conclusively presumed to know how it was organized, and the law governing that organization.

" The defendant knew when it entered into the contract of Dec. 31, 1891, that the $8,000 to be paid on or about April 1, 1892, was to come to Mrs. Blood from James McDade ; the defendant also knew that as a condition precedent to the payment of the $8,000 by McDade to Mrs. Blood, the Carbon Mfg. Co., Ltd., must be dissolved, or title to the Kane branch of the works vested in some manner in James McDade.

" The defendant knew that the capital stock of the Carbon Mfg. Co., Ltd., was $84,000, consisting of 840 shares of $100 each. It also knew that A. R. Blood held 593 of these shares which were pledged to it as collateral security. It also knew of the contract between Mrs. Blood and McDade, by which the $8,000 was to be paid, and knew that its assent was necessary to carry out that contract. The defendant knew, or, as a matter of law, was bound to know, that the moment A. R. Blood died, his interest in the limited company could not participate in the future business of the company, without the assent of a majority of the members in number and value of interests. But A. R. Blood held a majority of all the stock, so that it was impossible, under the wording of the law, that either his estate or the defendant, as holder of the stock, should become a member of the company.

" For the same reasons there could not be a dissolution of the company under the act of June 2, 1874. But while this was the condition of affairs, it did not follow that all interested in said company could not dispose of its assets as they saw fit. The defendant, by agreeing to accept the $8,000 to be paid by McDade, agreed to a voluntary dissolution of the company, and was as much bound to do every act necessary to carry out

McDade's contract with Mrs. Blood, as if it was an express party thereto.

" The Carbon Mfg. Co., Ltd., with the consent of all its members, Mrs. Blood as executrix, and the defendant, could have vested title to the property of that company in whomsoever they pleased, and in the absence of creditors (who are not shown to exist), no person existed who could question its legality. But without the defendant's consent, nothing could be done, so that when it, through its treasurer, refused to join with Mrs. Blood in carrying out her arrangement with Mc-Dade, it violated its own contract, and it made it impossible for Mrs. Blood, the plaintiff, to carry out her contract with defendant. Seipel v. International Ins. Co., 84 Pa. 47 ; 1 Addison on Contracts, §§ 321, 325, 326.

" And when the defendant notified the plaintiff that it would do nothing to carry out that contract unless its whole debt was first paid, including the $5,088 assigned to it by Curtze, for which the Carbon stock was not pledged, the defendant relieved the plaintiff from compliance with her agreement. In other words, the notice was equivalent to a breach of the contract: Ballou v. Billings, 136 Mass. 309.

" Little need be said in relation to the seventh conclusion of law. There is not a particle of evidence showing that the Carbon Mfg. Co. stock was pledged to Mr. Curtze as security for the payment of this claim for $5,088. On the contrary it is shown that the debt did not exist in A. R. Blood's lifetime. And as a matter of law the master is of the opinion that there can be no recovery against the estate for the $5,088 now claimed to be owing, growing out of the Curtze contract. But if Curtze did not hold this stock as collateral, certainly the defendant by its purchase could place itself in no better position.

" Mrs. Blood as executrix, had no right to give Mr. Curtze a preference over any other creditor, and when she refused to do so, she simply performed her duty.

" The defendant peremptorily refused to permit Mrs. Blood to redeem the pledge by payment of the amount of the debt for which it was pledged. It demanded not only this but $5,088 in addition thereto. This it had no right to do, and the sale of the stock for nonpayment of such an amount was un-

lawful, and, being unlawful, was a conversion of the stock. The fact that immediately before the sale the defendant withdrew the claim for the $5,088 is immaterial, as it was not reasonable to demand payment or expect compliance on such short notice."

The master recommended a decree dismissing the bill for the following reasons :

" First. The evidence discloses the fact that the Carbon Mfg. Co. stock, in part at least, has passed into the hands of parties who are not parties to this bill, and it is impossible for the defendant to comply with a decree such as is asked for.

" Second. It is shown that as a condition precedent to paying the $30,000 the plaintiff demanded and received the Crew Levick Co. stock of the face value of $100,000, the Muir Oil Co. stock of the face value of $40,000, and the Sterling Oil Co. stock of the face value of $16,140.   These stocks the plaintiff still holds, and I am at a loss to see how a decree can be made in favor of the plaintiff until the stock in question is restored to the defendant.

" Third. The evidence as to the value of the stock in question is not such that the master feels like placing a value on the stock itself, and if any relief is to be granted to the plaintiff it should be an order for the restoration of the money paid, together with the interest thereon, as provided and asked for in plaintiff's seventh prayer for relief.   If this is done it must be upon the theory that the plaintiff has a. right to abrogate the contract of December 31, 1891, and recover the consideration paid by her under that contract, upon the ground of failure of consideration.   But to do this she must restore the stock, or offer to restore it, that she received when she paid the $30,000. Moreover, the money paid did not belong to the estate, but was the private property of Mrs. Blood.   The agreement was between the defendant and herself individually, and not as executrix.   In a suit brought by her for a rescission of said contract and a recovery of the money paid, Mr. Curtze might be a competent witness to testify to facts occurring in the lifetime of A. R. Blood, when in the present action his mouth is closed. To make a decree therefore based upon the evidence in this case in favor of Mrs. Blood individually, that she would not be entitled to as executrix, would be unfair.

" But it seems to the master that if Mrs. Blood is entitled to any relief her remedy is in a court of law rather than in equity. If her theory be correct, and the defendant has received $30,000 of her money without consideration, she has a plain, open remedy for its recovery in an action at law.   In that action a jury will decide the disputed questions of fact much more satisfactorily than can the master.   But even if this be not so it is a right of which the defendant ought not to be deprived, without stronger reasons than appear in this case.

" In short, I am of the opinion that the plaintiff's bill should be dismissed without prejudice, that she may prosecute her rights, if so disposed, at law, and will recommend a decree accordingly."

Defendant filed exceptions among others to the master's 6th and 7th conclusions of law, quoted in the opinion of the Supreme Court.

The court sustained these exceptions and dismissed all others and dismissed the bill for the following reasons :

".Upon a failure to pay at the time agreed upon in the note, the right of enforcing collection by a sale of the stock pledged under the original agreement between the bank and A. R. Blood, it seems to me, cannot be questioned, and the only inquiry must be, did it make the sale upon sufficient and legal notice ?   No complaint is made that the notice was insufficient, or irregular as to time or place fixed for the sale.   It was served upon the plaintiff and published as well.   The complaint of the plaintiff is that, in the notice, demand was made for a larger sum than the bank could lawfully hold the stock in pledge for, and this is undoubtedly true.   While as assignee of the claim of Mr. Curtze it probably became the owner thereof, and could demand its payment from the estate of .A. R. Blood, it could not hold the stock as security for it.   But I cannot see that a demand for the payment of the whole amount, including the claim assigned by Mr. Curtze, invalidated the notice, and thereby rendered the sale irregular and an unlawful conversion.   The right to. sell for the amount of the original indebtedness existing, the plaintiff could only prevent the sale by tendering the amount admittedly due, if the demand had been for the proper amount.   She could have prevented the sale by the same tender in this case although more was demanded.   Or, if the bank

had refused to accept the tender, the sale would have been an unlawful conversion, and have subjected the bank to a liability to the plaintiff therefor. The sale was for the exact amount of the admitted balance, so that it cannot be contended that more stock was sold than was necessary to pay the claim."

*Errors assigned* were action on exceptions, and decree, quoting them.

*Samuel T. Neill, S. M. Brainerd* with him, for appellant.— The agreement of plaintiff to redeem the stock pledged to defendant by her testator, was distinct from her obligation as executrix to pay his debt. Her title as executrix could be treated as surplusage: Stephens v. Cotterell, 99 Pa. 191.

Plaintiff was entitled to specific performance of the agreement of Dec. 31, 1891, when the bill was filed.

The specific performance of contracts relating to sale and transfer of stocks is within equity jurisdiction in this state: Goodwin Stove Co.'s Ap., 117 Pa. 514; Reading Trust Co. v. Reading Iron Works, 137 Pa. 282; Willis v. R. R., 6 W. N. 461; Brush Electric Light Co.'s Ap., 114 Pa. 574; 1 Redfield on Railroads, 132; Adams' Eq. 83; Todd v. Taft, 7 Allen, 371; Conyngham's Ap., 57 Pa. 474; Diller v. Brubaker, 52 Pa. 498; Torrey v. Bank, 9 Paige, 649.

A tender by plaintiff of the amount due defendant was waived: Macky v. Dillinger, 73 Pa. 85; Youst v. Martin, 3 S. & R. 423; Mitchell v. Mining Co., 67 N. Y. 280; Ballou v. Billings, 136 Mass. 309; Vaupell v. Woodward, 2 Sand. Ch. 146; Kortright v. Cady, 21 N. Y. 343; Hills v. Bank, 105 U. S. 321.

The offer at the sale to abandon the Curtze claim came too late, and was not made in good faith and was unreasonable: Kortright v. Cady, 21 N. Y. 343; Hunter v. Le Conte, 6 Cow. 728; Taylor on L. & T. 731.

Plaintiff was entitled to compensation in damages or the restitution of her money.

When a court of equity has once jurisdiction it must settle and determine every question: Reading Iron Works' Est., 149 Pa. 182; Drake v. Lacoe, 157 Pa. 39.

The rule of law makes defendant liable for the highest mar-

ket value between the time of conversion and the hearing: Conyngham's Ap., 57 Pa. 474; Persch v. Quiggle, 57 Pa. 247.; Reading Trust Co. v. Reading Iron Works, 137 Pa. 282; Broom's Legal Maxims, 903.

Plaintiff has a right to restitution. There is no difficulty in the pleadings in granting this relief. The right to such alternative relief is recognized in all courts of equity: Hardin v. Boyd, 113 U. S. 763; Wilhelm's Ap., 79 Pa. 141; Aday v. Echols, 18 Ala. 353; Shafer's Ap., 110 Pa. 387; 1 Pom. Eq. 240; Stratham v. Ins. Co., 93 U. S. 24; Ballou v. Billings, 136 Mass. 307; Ins. Co. v. McAden, 109 Pa. 399; Seipel v. Ins. Co., 84 Pa. 47; Slemmer's Ap., 58 Pa. 155; Story's Eq. § 772.

*E. L. Whittelsey, Wm. A. Galbraith* with him, for appellee. —If an article be pledged for an indefinite time, the pledgee cannot sell without notice to the owner: DeLisle v. Priestman, 1 Browne, Pa. 176; Davis v. Funk, 39 Pa. 243; Diller v. Brubaker, 52 Pa. 498; Story on Bailments, 319; Conyngham's Ap., 57 Pa. 474; Sitgreaves v. Bank, 49 Pa. 359; Richards v. Davis, 5 Clark, 471.

A chancellor will make no decree where the respondent swears directly in answer to allegations in the bill. In such cases there must be another witness, or else corroborating circumstances to overbear defendant's answer: Horton's Ap., 13 Pa. 67; Nulton's Ap., 103 Pa. 286; Greenlee v. Greenlee, 22 Pa. 225; Audenreid v. Walker, 11 Phila. 183; Eaton's Ap., 66 Pa. 483; Cresson's Ap., 91 Pa. 168; Audenreid's Ap., 89 Pa. 114; Campbell v. Patterson, 95 Pa. 447; Burke's Ap., 99 Pa. 359; Rowley's Ap., 115 Pa. 150; Fidelity Trust Co. v. Weitzel, 152 Pa. 498.

As to when parol evidence is admissible to vary written instruments see: Phillips v. Meily, 106 Pa. 536; Thomas & Sons v. Loose, Seaman & Co., 114 Pa. 35; Van Voorhis v. Rea, 153 Pa. 19; Halberstadt v. Bannan, 149 Pa. 51; Jackson v. Payne, 114 Pa. 67; Jones v. Backus, 114 Pa. 120; Cullmane v. Lindsay, 114 Pa. 166; Sylvius v. Koseck, 117 Pa. 67; Smith v. Ewing, 151 Pa. 256; Campbell v. Patterson, 95 Pa. 454.

There could not, under any circumstances, be a recovery or decree for the $30,000 paid, without a return or offer to return

the stock received by the plaintiff when the money was paid: Beetem v. Burkholder, 69 Pa. 249; Morrow v. Rees, 69 Pa. 368; Schwartz v. McCloskey, 156 Pa. 258; Cobb v. Hatfield, 46 N. Y. 533; Scheffer v. Dietz, 83 N. Y. 300; Strong v. Strong, 102 N. Y. 69; Miner v. Bradley, 23 Pick. 457; Coolidge v. Brigham, 1 Metc. 547; Erwin v. Downs, 15 N. Y. 575; Remsen v. Graves, 41 N. Y. 471; Bank v. Kurtz, 99 Pa. 344; 10 A. & E. Ency. L. 162; Bank v. Warren, 15 N. Y. 577; Mundorf v. Wickersham, 63 Pa. 87; Mfg. Co. v. Aughey, 144 Pa. 398; Gas Co. v. Cook, 123 Pa. 170.

A bare refusal to receive the sum proposed, and demanding more, is not alone sufficient to excuse an actual tender: 2 Greenl. Ev. 603; 2 Parsons's Cont. 636.

A court of equity had no jurisdiction in this case. There was no necessity for an account as the amount of the indebtedness had been agreed upon by the parties: 3 Story, Eq. 1032; Roland v. Bank, 135 Pa. 598; Paton v. Clark, 156 Pa. 49; Weaver v. Shenk, 154 Pa. 206.

*Samuel T. Neill, S. M. Brainerd* with him, for appellant, in reply.—A party who dispenses with, or prevents performance of a contract, cannot take advantage of the non-performance by the others: Groves v. Donaldson, 15 Pa. 128; 1 Add. Cont. 321.

Defendant having announced, before April 1, 1892, that it would not perform its contract except upon terms it had no right to exact, was in default: Hocking v. Hamilton, 158 Pa. 107; 1 Add. Cont. 326; Wheelock v. Tanner, 39 N. Y. 481; Casa v. Higenbotam, 100 N. Y. 248; Haskins v. Kelly, 1 Rob. (N. Y.) 160; Kortright v. Cady, 21 N. Y. 343; Ins. Co. v. McAden, 109 Pa. 399; Seipel v. Ins. Co., 84 Pa. 47.

Defendant's attempt to compel payment of the Curtze claim was a fraud upon plaintiff: Stephens v. Cotterell, 99 Pa. 188; Story on Bailments, 304; Wyckoff v. Anthony, 90 N. Y. 442; Duncan v. Brennan, 83 N. Y. 487; James's Ap., 89 Pa. 54; Dickinson v. Calahan's Admrs., 19 Pa. 27; Quain's Ap., 22 Pa. 510; 1 Story, Eq. 187; Adams's Eq. 176.

Plaintiff was not bound to pay or tender the whole balance of the debt on the day of the sale.

The purchase of these shares by defendant was an act of

bad faith : Story on Bailments, § 319 ; Ins. Co. v. Dalrymple, 25 Md. 242; Bank v. Minot, 4 Metc. 325.

The sale of these shares was in pursuance of a preconcerted scheme on part of defendant to defraud plaintiff.

Plaintiff was not bound to return the fictitious and worthless stock : Seipel v. Ins. Co., 84 Pa. 47.

Equity had jurisdiction : Act of June 16, 1836, § 1, P. L. 789; Bisph. Eq. §§ 459, 460; 3 Pom. Eq. §§ 1337–42; Brush Electric Light Co.'s Ap., 114 Pa. 574 ; Neiler v. Kelley, 69 Pa. 403.

There was sufficient evidence of the value of the stocks converted. The presumption is they were worth par : Thayer v. Manley, 73 N. Y. 305 ; Booth v. Powers, 56 N. Y. 22 ; Ingalls v. Lord, 1 Cow. 240 ; Thomas v. Waterman, 7 Metc. 227 ; Decker v. Mathews, 12 N. Y. 313.

OPINION BY MR. CHIEF JUSTICE STERRETT, Oct. 1, 1894 :

In view of the able and exhaustive report of the learned master, special reference to the general facts of this case is deemed unnecessary. We shall therefore confine ourselves, as far as possible, to such of his findings of fact and conclusions of law as are of controlling importance and appear to have been fully warranted by the proofs, etc.

When plaintiff's husband died, December 31, 1891, he was indebted to defendant in the sum of $54,227.12, no part of which was due, except possibly an overdraft of $125.72. As collateral security for said indebtedness, defendant held certain stocks, which had been deposited by plaintiff's husband, of the face value of $215,440, including 593 shares of the Carbon Manufacturing Co. Limited, the par value of which was $100 per share. Of these stocks, specified in the third paragraph of the master's findings of fact, the " Crew Levick Co.," $100,000, proved to be forged. The actual value of the " Sterling," and the " Muir " Oil Company stocks was not shown. The Carbon Manufacturing Company stock was delivered to the defendant March 21, 1891, and receipted for as follows : " Received from A. R. Blood stock certificate No. 6 for 593 shares of paid up stock in the Carbon Manufacturing Co. Ltd. of Warren, Pa., to be held as collateral security for the payment of any notes, drafts, bills or other obligations, discounted or held by the bank against said Blood."

On December 31, 1891, an agreement was entered into between plaintiff and defendant by which the former was to pay, on account of said indebtedness, $30,000 of her individual funds, and also $8,000 which she expected to receive from Mr. McDade on or about April 1, 1892, in pursuance of an arrangement made with him for dissolution of said Carbon Manufacturing Co. Ltd., as stated in the master's fourth finding of fact; and, in consideration thereof, the defendant agreed to extend payment of the residue of said indebtedness " a reasonable length of time upon furnishing approved security." On February 3, 1892, plaintiff paid defendant the $30,000 from money received by her from the Traveller's Insurance Co. In connection therewith, defendant surrendered to her the Sterling Oil Co. stock, Muir Oil Co. stock and the Crew Levick Co. stock aforesaid. No demand was then made for the surrender of the Carbon Manufacturing Co. Ltd. stock, but plaintiff's agent did ask that the Danforth drafts, to the amount of $30,000, should be surrendered, which defendant's treasurer and agent agreed to do two or three days later, when he should have computed the accrued interest thereon, but he subsequently refused to surrender the drafts or any part of them until all were paid.

On March 1, 1892, defendant refused to surrender to plaintiff the stock held by it, or to enter into any arrangement with her by which said Carbon Manufacturing Co. Ltd. could be dissolved and the agreement between her and McDade carried out, unless an alleged debt of $5,088.94, from plaintiff's husband to F. F. Curtze, defendant's treasurer, was included in the amount to be secured. This demand was wholly unjust and unwarranted, but it was persisted in by defendant, and plaintiff was thus prevented from carrying out her agreement with McDade, which she could have done but for the bad faith and unjustifiable conduct of defendant and its agent Curtze.

On April 5, 1892, the defendant advertised the said 593 shares of the Carbon Manufacturing Co., Ltd., for sale at public auction on the 23d of April, 1892, for payment of balance of the indebtedness aforesaid, claiming that the same amounted to $30,189.44. This sum included the unfounded claim of said Curtze which had been assigned by him to the bank. On or prior to April 12, 1892, plaintiff's agent called on defendant to ascertain whether payment of the balance of said indebt-

edness—less the Curtze claim—would be accepted and the stock surrendered ; but the defendant, as it had theretofore persistently done, declined to consider any proposition that did not include the Curtze claim.   On April 22, 1892, plaintiff filed her bill to enjoin the proposed sale, but her prayer for an injunction was denied; and, pursuant to the published notice, the stock was sold and bid in for defendant, by an authorized agent, for $24,718.25, the balance claimed to be due it, not including the Curtze claim.   Of the stock thus bid in by the defendant, through its authorized agent, Davenport Galbraith, 174 shares were afterwards purchased by said McDade and 105 shares by said Curtze. .

In his fifth, sixth and seventh conclusions of law the learned master rightly held :

(1) " That the time fixed for the payment of the $8,000 was indefinite, and not such an essential part of the. contract as would justify the defendant in abrogating it because of a failure to pay said amount on April 1, 1892."

(2) " That the failure of the plaintiff to pay the $8,000 on or about April 1, 1892, having been caused by the neglect and refusal of the defendant to co-operate with the plaintiff in winding up the affairs of the Carbon Manufacturing Co., Ltd., the defendant had no right to sell the 593 shares of Carbon stock in April, 1892, and its sale was an unlawful conversion of said stock."

(3) " That the sale of said 593 shares of stock having been made in default of a demand for payment of a debt which included about $5,088, for which the stock was not pledged, such sale was an unlawful conversion of said stock, and the fact that, immediately prior to such sale, the defendant offered to accept the amount of its demand, less the $5,088, did not make the sale valid, reasonable time not being granted the plaintiff within which to comply with said offer."

The correctness of these legal conclusions is so amply sustained by the learned master in his report that they require no further vindication at our hands.   But his eighth conclusion of law : " That the plaintiff cannot sustain the action, and the bill must be dismissed," is a departure which cannot be sustained.   Starting with the sound and well fortified position announced in the two preceding conclusions,—that, in the cir-

cumstances, the sale was an unlawful conversion of plaintiff's stock—we are clearly of opinion that, upon being paid the actual balance for which the stock was pledged, defendant was at least bound to surrender the stock; and a decree to that effect, at least, would have been warranted if the defendant had not, in defiance of the claim asserted in the bill, disposed of nearly one half of the stock and thus disabled itself from complying with such decree. It cannot surely be that the defendant, by first wrongfully converting the stock and then voluntarily disposing of it as its own, put it out of the power of a court of equity to redress the double wrong. If defendant had been disposed to act fairly, it would have retained possession of the stock until the plaintiff's right to its surrender, upon payment of the actual balance, was determined by the court. Before the stock was put to sale, and afterwards, the court had undoubted jurisdiction of the case presented in the bill, and its jurisdiction could not be ousted by the act of the defendant in wrongfully disabling itself to restore the pledge in controversy. Its conduct in that regard was in harmony with its previous acts of bad faith found by the master.

The reasons given by the master in support of said conclusion are fully presented in his report and need not be repeated. Neither of said reasons, nor either of those given by the court below, appears to be sufficient to justify the decree complained of. The bill to restrain the sale and for redemption of the stock was filed before the day of sale. The preliminary injunction having been refused, the sale was effected as above stated. Defendant's answer set up the fact of the sale, and it appearing that defendant had bid in the stock and afterwards sold 174 shares thereof to McDade and 105 to Curtze, the plaintiff thereupon obtained leave to amend her bill by adding two provisional prayers for relief, the first of which is as follows: "If, notwithstanding the filing of her bill of complaint and pending an investigation of the truth of the facts therein set forth, the said defendant should convert said shares of stock now held in pledge by it, or any part of them, to its own use as your orator apprehends," etc., " then your orator prays that the defendant may be ordered and decreed to account to your orator, as executrix of said estate, for the full value of said stock at the date of said conversion, and after deducting there-

from the balance of the indebtedness of A. R. Blood, deceased, remaining unpaid, exclusive of usurious interest thereon, and pay over to your orator, as such executrix, the amount that shall then be found to be due to her with interest."

In view of the facts rightly found by the master, and especially his finding that redemption of the pledge had become impossible or inexpedient by reason of defendant's conduct after the bill was filed, we think the plaintiff is at least entitled to be compensated in damages measured by the value of the stock which it illegally and tortiously converted to its own use; and, if it be necessary to that end, that the bill should be amended, it may be done or considered as done here.

We have no finding of the value of the 593 shares in question, for the reason, as the master says, that he did not "feel at liberty to make a finding as to the value of the stock." We think, however, that there is evidence from which he might and ought to have made such finding. As we have seen, the defendant receipted for the 593 shares as "paid up stock," and it is conceded that its par value was $100 per share. One of the witnesses, who was secretary of the company prior to the sale, and familiar with its business, testified, in substance, that at the time of sale the stock was worth par; that during the period it was held as collateral, and up to the time it was sold, it paid a dividend of two per cent a month. After testifying to the interview she had with Mr. Curtze, the treasurer and agent of the defendant, on December 31, 1891, and the reasons she gave him for wanting to redeem the stock, the plaintiff herself, in answer to the question, "State whether you communicated that to Mr. Curtze," replied: "I did; I gave him as a further reason for wishing to obtain this stock—to obtain control of it—that it was worth far more than the indebtedness to the bank, and Mr. Curtze agreed with me that it was worth far more than that." "Question: That is, than the whole amount?" "Answer: Yes, sir." Again, in answer to the question, "What, if anything, had he (Curtze) said to you about letting him have the stock?" her reply was: "He said, 'Mrs. Blood, I think I can save some money for you, if you will make that stock (the 593 shares) over to me; I will keep it until the profits pay the indebtedness at the bank and then I will give the stock back to you.' I refused for the same reasons I had given before." It

is fair to assume, from Mr. Curtze's connection with and interest in the matter, that he was familiar with the value of the stock, and spoke truthfully when he assured plaintiff that it was worth more than the entire indebtedness to the bank, which at that time (December 31, 1891) was over $54,000. It was not until February 3, 1892, that the indebtedness referred to was reduced by plaintiff's payment of $30,000, on account thereof, out of her own funds.

This testimony as to the value of the stock was not contradicted or questioned by defendant. Curtze and McDade, both engaged in the lamp-black business—the latter a stockholder in the same company—were both witnesses for defendant. In addition to that, there is the significant fact that one of them bought from the defendant 105 shares and the other bought 174 shares of the same stock, bid in by it at the sale. Both of them must have known the value of the stock they thus bought. If these witnesses, or either of them, could have rebutted the testimony, as to value, introduced by the plaintiff, it is fair to presume they would have been interrogated on that subject. " When a party has the means in his power of rebutting or explaining the evidence adduced against him, if it does not tend to the truth, the omission to do so furnishes a strong inference against him. Thus when a person who has wrongfully converted property will not produce it, it shall be presumed, as against him, to be of the best description. *Omnia præsumuntur contra spoliatorem :*" Broom's Leg. Maxims, 903.

The business of the Carbon Manufacturing Company Limited was of such a peculiar nature that the value of its stock was more difficult of proof than that of companies engaged in ordinary branches of business ; but a careful consideration of the uncontradicted testimony adduced by the plaintiff has led us to the conclusion that it was quite sufficient to have warranted the learned master and court below in finding that the stock in question was worth at least par at the time it was wrongfully converted by the defendant to its own use, and that they should have so found. The defendant should therefore be charged with the par value of said stock, $59,300, from which should be deducted the balance of indebtedness due defendant on April 23, 1892; thus leaving the sum of $34,581.75 as the balance in favor of plaintiff, for which she is entitled to a decree with interest from said April 23, 1892.

Decree reversed, and it is now adjudged and decreed that the defendant pay the plaintiff the sum of $34,581.75 damages, with interest from April 23, 1892; and it is further ordered that defendant pay the costs, including the costs of this appeal.