METROPOLITAN TRUST CO. OF NEW YORK v. McKINNON.

(Circuit Court of Appeals, Second Circuit. June 16, 1909.)

No. 285.

1. BANKS AND BANKING (§ 109*)—PURCHASE OF SECURITIES—ACTS OF OFFICER—TITLE.

Where a bank purchased certain securities at the suggestion of its vice president, who announced that he would make the purchase on behalf of the bank, and subsequently informed the directors that he had done so, and still later turned over certain of the securities to the bank with a letter authorizing it to receive the balance, and at the trial of an action for conversion acknowledged that his intention had been to turn over the securities to the bank on payment of a note for which they were pledged, his possession of the securities was the possession of the bank, and title to the securities was in it.

[Ed. Note.—For other cases, see Banks and Banking, Dec. Dig. § 109.*]

2. SUBROGATION (§ 22*)—REDEMPTION OF PLEDGED SECURITIES.

Where certain stock was purchased by a bank's vice president and another in separate shares, and all of the stock was pledged for a loan to both, the bank, being compelled to pay the whole loan in order to release its share of the stock, was subrogated to the rights of the pledgee as against the balance.

[Ed. Note.—For other cases, see Subrogation, Cent. Dig. § 48; Dec. Dig. § 22.*]

3. BANKS AND BANKING (§ 260*)—ULTRA VIRES ACTS—PURCHASE OF BANK STOCK.

Purchase of national bank stock for speculation by a national bank is ultra vires.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 977; Dec. Dig. § 260.*]

4. CORPORATIONS (§ 385*)—ULTRA VIRES CONTRACT.

The obligation of an ultra vires contract is void, whether executed or executory.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1545-1547; Dec. Dig. § 385.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**5.** BANKS AND BANKING (§ 101*)—PURCHASE OF STOCK—ULTRA VIRES ACT.

That a bank's purchase of stock in another bank was ultra vires did not prevent it from getting title to the stock, both because an ultra vires contract is simply unauthorized and not forbidden by law, and because the passing of title depends on the intention of the parties and the performance of the requisite formalities by the parties, regardless of whether they are engaged in an illegal enterprise.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 237, 238; Dec. Dig. § 101.*]

**6.** ESTOPPEL (§ 56*)—CHANGE OF POSITION.

Where a pledgee of certain bank stock did not act on the owner's repudiation of the pledge, the owner was not estopped to change its position, and by subsequently tendering the amount of the debt acquire a right to the stock.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. § 142; Dec. Dig. § 56.*]

In Error to the Circuit Court of the United States for the Southern District of New York.

This is an action of trover, originally brought by the receiver of the National Bank of North America in New York, for whom the present defendant in error was later substituted as agent for stockholders. For convenience the plaintiff in error will be referred to as the "trust company," and the defendant in error as the "bank." By stipulation it was agreed that, instead of damages, the bank, if successful, should be entitled to 1,000 shares of stock in the Chase National Bank upon the payment of $150,000, with interest from June 14, 1907, and judgment was entered in accordance with the stipulation. The case was otherwise tried as though it were an ordinary action of trover for the value of the shares of stock.

On January 10th Clinton Gilbert and Charles W. Morse mutually agreed to purchase jointly 5,630 shares of stock in the Chase National Bank at the price of $1,107,230 from certain third persons. One-quarter of this sum they paid to the sellers at once, of which Gilbert contributed $50,000 and Morse $226,807.50, which was the balance. Of the sum paid by Morse, he received one half from the bank, and the other half from the Van Norden Trust Company. The bank received a note of one W. W. Robinson for the half which it paid, and the Van Norden Company the note of Edward B. Wire, for the other half. Robinson was an official in the Van Norden Company, and Wire was an official in the bank.

Gilbert, between January 10, 1907, and June 10, 1907, sold to sundry individuals 130 shares and to Arthur P. Heinze, 2,815 shares, both at a large profit. Heinze obtained part of the purchase price of these shares from the trust company, as follows: He made a note for $150,000 dated June 12, 1907, to his own order, which he indorsed, and which recited that it was secured by 500 shares of Chase National Bank stock, and 2,000 shares of United Copper Company stock, and this note and collateral he delivered to Morse. Before this, 500 shares of the Chase National Bank stock had come into the possession of Morse, under circumstances which will be stated hereafter. These 500 shares, together with the 500 shares which belonged to Heinze, Morse pledged with the trust company for a loan of $150,000, for which he gave his own note, and with the proceeds of which he paid part of the purchase price of the Chase National Bank stock to the sellers. On January 3, 1907, at a meeting of the bank's directors, Morse, who was at that time vice president, had informally told the bank's directors at a regular meeting that a handsome profit could be made by speculating in Chase National Bank stock. It was then also informally agreed among the directors that Morse should make the purchase, and that the bank should take a one quarter interest, and the Van Norden Company another quarter interest; Gilbert retaining his half under the con-

tract before alluded to. On January 17, 1907, Morse had also informed the directors, at another regular meeting, that the transaction had been completed.

On June 18, 1907, and after the sellers of the stock had been wholly paid, there remained in the possession of Gilbert and Morse 2,685 shares of the Chase National Bank stock, fully paid. In addition to this, there remained in Morse's hands the sum of $73,509.45, which was applicable in repayment of the sum that Morse had received from the bank and the Van Norden Company, as stated above. This sum he returned in equal shares to the bank and the Van Norden Company. so that the total sum paid by each of these institutions was $76,649.02, for 670 shares of the stock. Gilbert, in whose name the certificates of stock were issued, indorsed and at various times before June 18, 1907, turned over to Morse, 1,340 shares of stock, of which Morse gave 670 to the Van.Norden Company and 170 to the bank; the remaining 500 shares having been theretofore pledged with the trust company, as has already been shown. In regard to these, Morse wrote a letter on June 14, 1907, directed to the trust company, authorizing the delivery to the bank of all the collateral which they held against Morse's note of $150,000.

On October 30, 1907, the bank's president advised the trust company that it claimed the right of possession of all this collateral, subject to the pledge; but later, and on November 27, 1907, the president again wrote the trust company, this time advising them that the bank would not pay the loan, and it authorized the trust company, on payment of the loan by Morse, to deliver the collateral to him. On January 30, 1908, by a second change of position, the bank made tender of the full amount of the note and demanded of the trust company the shares in question. Prior to that time, however, Morse had himself made claim for the stock, and has since brought action against the trust company, which, for some reason not disclosed, did not.interplead him in this action.

At the close of the evidence, the learned circuit judge directed a verdict for the plaintiff.

Herbert Parsons, for plaintiff in error.

Underwood, Van Vorst & Hoyt (J. Markham Marshall, of counsel), for defendant in error.

Before COXE and NOYES, Circuit Judges, and HAND, District Judge.

HAND, District Judge (after stating the facts as above). Only two questions arise in this case: First, whether the bank had the immediate right of possession to 1,000 shares of stock; and, second, whether it has estopped itself as against the trust company. As the learned judge at trial directed a verdict, the plaintiff in error is entitled to the most favorable construction possible of all the testimony. There appears to be no basis in the bill of exceptions for the statement in the brief of the defendant in error that both sides requested the direction of a verdict.

Of the 1,000 shares pledged with the trust company, Heinze undoubtedly owned one half, subject to the pledge, and either Morse or the bank owned the other half. The question, then, is, in whom legal title to that other half was vested, Morse or the bank? All the purchase price came from the bank's treasury, although it is true that, in order to preserve the color of legality for the transaction, notes of equal amount were exchanged between the Van Norden Company and the bank; which were subsequently canceled without payment; but title at law depends upon intention, not equity and it does not fol-

low that Morse did not hold title to the shares, even if it were subject to a resulting trust.

However, there was no question of fact before the court as to the character of Morse's holding, because, before the purchase, he had announced that he would make it on behalf of the bank, and subsequently he informed the other directors that he had purchased it for the bank. Later he turned over 170 shares to the bank, and gave it a letter authorizing it to receive the rest of the stock, together with Heinze's. Upon the trial he acknowledged that he had meant to turn over the stock to the bank upon the payment of Heinze's note. Morse's possession of the certificates was therefore clearly intended. when he took them, to be as agent for the bank, and the title to the 500 shares of stock vested in the bank, whatever Morse may now claim.

Morse, however, pledged these certificates with the trust company along with Heinze's shares, for $150,000, and the question then arises whether, upon tender, the bank could demand, not only its own shares, but Heinze's shares. Concededly the bank had no interest in Heinze's shares, except that it would not obtain its own without tender of the principal and interest of the whole loan, since the trust company had the right to retain possession of all the shares until the loan was paid. Must it, then, having paid the loan, leave with the bank Heinze's shares for the bank to turn over to Heinze? Or could it subrogate itself to the pledge of the bank as against Heinze's shares, in order to release its own? I think there can be no doubt that it could. In paying the loan the bank was not a mere intermeddler. It was protecting its own property, and that it could not do, except by releasing Heinze's shares. Being wrongfully put in this position by one of its own agents, it was not a volunteer, and it might demand of the trust company Heinze's shares, and hold them under the same pledge as the trust company itself enjoyed. If this be true, then, upon tender of the full amount it was entitled to the possession of all of the collateral; one half as owner, and the other as substituted pledgee.

The plaintiff in error makes two objections: First, that the purchase of National Bank shares by the bank was ultra vires; the second, that the bank is estopped. It is undoubtedly true that the purchase by the bank was ultra vires (California Bank v. Kennedy, 167 U. S. 362, 17 Sup. Ct. 831, 42 L. Ed. 198; Concord First National Bank v. Hawkins, 174 U. S. 364, 19 Sup. Ct. 739, 43 L. Ed. 1007; First National Bank v. Converse, 200 U. S. 425, 26 Sup. Ct. 306, 50 L. Ed. 537); and it is also true that the obligation of an ultra vires contract is void, whether executed or executory (De La Vergne v. German Savings Institution, 175 U. S. 40, 20 Sup. Ct. 20, 44 L. Ed. 65). So there is no question but that, if the bank had sued the sellers or Gilbert for the shares of stock. even after the payment by Morse, it could not have recovered on the obligation; but in this case the bank did not need to avail itself of any obligation whatsoever. When Morse got the certificates, he took them as agent only, as I have said, and his intention was that the title pass from Gilbert directly to the bank, for whom he merely received custody. To succeed, the plaintiff in error must assert that, because the bank's title arose from the per-

172 F.—54

formance of an ultra vires contract, therefore it never got title. This is wrong, for two reasons: First, because an ultra vires contract is not forbidden by law, but simply not authorized; second, because it makes no difference, anyway, to the passage of title, whether or not the parties are engaged in an illegal enterprise, provided they intend title to pass and perform the requisite formalities. While the law will not compel by its sanctions the performance of acts promised by contract, but forbidden by law, it does not change the effect of the civil acts of persons merely because they are engaged in violating the law. These acts continue to have the usual consequences.

So much for the first objection. As to the second, the trust company does not show that it acted upon the bank's repudiation of the transaction by the letter of November 27, 1907. If so, there was no estoppel in pais, and the bank might repent of its repudiation and subsequently make a tender, which it did.

There was therefore no question for the jury, and the judgment should be affirmed.