**BALDWIN et al. v. CHASE NAT. BANK OF CITY OF NEW YORK, and three other cases.**

District Court, S. D. New York.
Aug. 5, 1936.

Conboy, Hewitt, O'Brien & Boardman, of New York City (Martin Conboy and John Vance Hewitt, both of New York City, George P. Barse, Brice Clagett, and George B. Springston, all of Washington, D. C., and Edward F. Butler, of counsel), for plaintiff.

Mudge, Stern, Williams & Tucker, of New York City (Henry Root Stern, George L. Trumbull, and Donald Kehl, all of New York City, of counsel), for defendant Chase Nat. Bank of City of New York.

KNOX, District Judge.

These four actions in equity are brought by receivers of national banks to recover funds now on deposit with the defendant, Chase National Bank of the City of New York. Since all four cases raise the same legal problems, discussion will be limited to the Baldwin case, with the conclusions to be considered as applicable to the other three.

In January, 1923, the Secretary of War, acting for the government of the Philippine Islands, opened a deposit account in the Commercial National Bank of Washington, the account being captioned, "Treasurer of Philippine Islands, Treasury Certificate Fund Account." This deposit account continued until the bank closed on February 27, 1933, at which time it amounted to $1,003,602.74. Beginning in 1925, the officers of the Bank turned over to the Chief of the Bureau of Insular Affairs of the War Department, on account of the government of the Philippine Islands, certain of the Bank's assets, consisting of bonds to secure the aforementioned deposit account. The Secretary of War acted under section 625 of the Revised Administrative Code of 1927 of the Philippine Islands, discussed infra. On the date of the Bank's closing, the assets intended to be pledged had a par value of $1,077,000. On March 1 and 2, 1933, the Secretary of War sold the securities for $997,448.33, which he eventually deposited with the Chase National Bank to the credit of "Treasurer of the Philippine Islands, Gold Standard Fund Account Demand Deposit." The plaintiff thereupon instituted this action against "The Chase National Bank of the City of New York, a National Banking Association, as a Corporation, as a Branch of the Philippine Insular Treasury, and as a Depository or agent of the Philippine Islands," to impress a trust upon the proceeds in favor of the plaintiff for the benefit of the creditors and stockholders of the defunct bank.

The defendant, Chase National Bank, contends that the complaint is defective for failure to join the Philippine government as an indispensable party. The defendant further contends that the Philippine government is a sovereign nation, is immune from suit without its consent, and cannot be brought into the case. Therefore the complaint should be dismissed. That the Philippine government is not a party to this action is conceded by both sides—by the plaintiff in his motion to amend the complaint and by the defendant in its motion to dismiss.

Thus, two general questions are presented:

(1) Is the Philippine government an indispensable party?

(2) If it is indispensable, can it be brought into this case?

Owing to the statutory limitations on the jurisdiction of subordinate federal courts, the matter of parties is frequently perplexing. The orderly administration of justice sometimes requires the court to proceed in the absence of persons who ordinarily should be parties to the cause. Jud.Code, § 50, 28 U.S.C.A. § 111; Equity Rule 39, 28 U.S.C.A. following section 723. In several instances the Supreme Court has undertaken to classify parties. Thus, in Barney v. Baltimore, 6 Wall. 280, 281, 284, 18 L. Ed. 825, Mr. Justice Miller said:

"There is a class of persons having such relations to the matter in controversy, merely formal or otherwise, that while they may be called proper parties, the court will take no account of the omission to make them parties. There is another class of persons whose relations to the suit are such, that if their interest and their absence are formally brought to the attention of the court, it will require them to be made parties if within its jurisdiction, before deciding the case. But if this cannot be done, it will proceed to administer such relief as may be in its power, between the parties before it. And there is a third class, whose interests in the subject-matter of the suit, and in the relief sought, are so bound up with that of the other parties, that their legal presence as parties to the proceeding is an absolute necessity, without which the court

cannot proceed. In such cases the court refuses to entertain the suit, when these parties cannot be subjected to its jurisdiction."

See, also, the classifications by Mr. Justice Curtis in Shields v. Barrow, 17 How. 130, 139, 141, 15 L.Ed. 158, and Mr. Justice Bradley in Williams v. Bankhead, 19 Wall. 563, 571, 22 L.Ed. 184.

Although the statements are sufficiently clear, their application in a particular case remains a serious problem. Whether a party falls within one or the other of the traditional categories of "proper," "necessary," or "indispensable" parties depends upon the facts of each case. See Roos v. Texas·Company, 23 F.(2d) 171, 172 (C.C.A.2d, 1927); 3 Cyc. of Federal Procedure, § 715; 1 Street, Federal Equity Practice, § 519. To be indispensable, the absent party must at least have such an interest in the subject-matter of the controversy that equity and the concepts of practical judicial administration necessitate his presence. If the absentee be without legal or equitable interest in the controversy, although his rights may be affected indirectly by the decision, he is not even a necessary party. Williams v. United States, 138 U.S. 514, 11 S.Ct. 457, 34 L.Ed. 1026; United States v. Hendy (C.C.) 54 F. 447. A fortiori, a party with no legal or equitable interest in the subject-matter is not an indispensable party. Manifestly, a pleader's simple assertion that an absent party has an interest is insufficient to render the absentee indispensable, especially where the effect will be to oust the court of jurisdiction. If an absentee is to be declared indispensable, the court must be satisfied that the case should not proceed without his presence.

As was aptly stated by Mr. Chief Justice Marshall in Elmendorf v. Taylor, 10 Wheat. 152, 162, 165, 166, 6 L.Ed. 289:

"Courts of equity require, that all the parties concerned in interest shall be brought before them, that the matter in controversy may be finally settled. This equitable rule, however, is framed by the court itself, and is subject to its discretion. It is not, like the description of parties, an inflexible rule, a failure to observe which turns the party out of court, because it has no jurisdiction over his cause; but being introduced by the court itself, for the purposes of justice, is susceptible of modification, for the promotion of those purposes."

See, also, the dictum of Mr. Justice Story in West v. Randall, Fed.Cas.No. 17,-424, 2 Mason, 181, 196.

Thus, sometimes, in deciding a jurisdictional question, a predisposition of a substantive problem which may go to the heart of the controversy becomes necessary. See Lane v. Watts, 234 U.S. 525, 540, 34 S.Ct. 965, 58 L.Ed. 1440; Northern Pacific Railway Company v. North Dakota, 250 U.S. 135, 39 S.Ct. 502, 63 L.Ed. 897; Minnesota v. Hitchcock, 185 U.S. 373, 22 S.Ct. 650, 46 L.Ed. 954; Green v. Van Buskirk, 5 Wall. 307, 18 L.Ed. 599 (deciding jurisdictional question); Id., 7 Wall. 139, 19 L.Ed. 109 (using same rationale, but deciding case on merits). Hamilton v. Savannah, F. & W. Ry. Co. (C.C.) 49 F. 412, 426, is directly in point at this stage. In that case the question was whether a certain party to an ultra vires transaction was an indispensable party. After deciding that the transaction had been absolutely void rather than merely voidable, the court said:

"Sufficient appears to give the plaintiffs a standing in court, at least for the purposes of litigating their rights and taking evidence, to show, if they can, that they are meritorious. All of these facts, of course, are made apparent merely by affidavits, or by the undisputed or conceded facts in the pleadings. After thorough investigation attainable by the usual progress of a suit in equity, a different appearance may be given to the case."

Hence in the instant case the court at the outset must decide, *for jurisdictional purposes alone,* whether the Philippine government has an interest which makes it an indispensable party.

The plaintiff urges the purported pledge to the Philippine government to have been ultra vires and void, passing no interest in the securities to the intended pledgee; the sale of the securities gave the Philippine government no interest in the proceeds, and since the Philippines has no interest in the fund in the Chase Bank, it is not an indispensable party. Thus, the cases cited by the defendant are distinguishable in that in those cases the parties not joined concededly had an existing legal or equitable interest, though sometimes voidable; Barney v. Baltimore, 6 Wall. 280, 18 L.Ed. 825; Christian v. Atlantic & North Carolina Railroad Co., 133 U.S. 233, 10 S.Ct. 260, 33 L.Ed. 589; Goldberg v. Daniels, 231 U.S. 218, 34 S. Ct. 84, 58 L.Ed. 191; Gregory v. Stetson, 133 U.S. 579, 10 S.Ct. 422, 33 L.Ed. 792; Morrison v. Work, 266 U.S. 481, 45 S.Ct. 149, 69 L.Ed. 394; Naganab v. Hitchcock, 202 U.S. 473, 26 S.Ct. 667, 50 L.Ed. 1113; Oregon v. Hitchcock, 202 U.S. 60, 26 S.Ct. 568, 50 L.Ed. 935; Russell v. Clarke's Ex-

ecutors, 7 Cranch, 69, 3 L.Ed. 271; Williams v. Bankhead, 19 Wall. 563, 22 L.Ed. 184; United States v. Bank of New York, 296 U.S. 463, 56 S.Ct. 343, 80 L.Ed. 331; California v. Southern Pacific Company, 157 U.S. 229, 15 S.Ct. 591, 39 L.Ed. 683; or had claimed an interest, which the plaintiff was seeking to cut off, United States v. Bank of New York & Trust Company, 296 U.S. 463, 56 S.Ct. 343, 80 L.Ed. 331; Hazeltine Corporation v. White (C.C.A.) 68 F. (2d) 715; or else the plaintiff's rights against the defendant depended upon proof of disputed facts as against the absent party. Commonwealth Trust Co. v. Smith, 266 U.S. 152, 45 S.Ct. 26, 69 L.Ed. 219; Coiron v. Millaudon, 19 How. 113, 15 L.Ed. 575; Goodman v. Niblack, 102 U.S. 556, 26 L.Ed. 229; Mallow v. Hinde, 12 Wheat. 193, 6 L.Ed. 599; State of Minnesota v. Northern Sec. Corp., 184 U.S. 199, 22 S.Ct. 308, 46 L.Ed. 499; Russell v. Clarke's Executors, 7 Cranch, 69, 3 L.Ed. 271; Shields v. Barrow, 17 How. 130, 15 L.Ed. 158; Swan Land & Cattle Co. v. Frank, 148 U.S. 603, 13 S.Ct. 691, 37 L.Ed. 577; cf. Donovan v. Campion (C.C.A.) 85 F. 71. Since there are no disputed questions of fact at the present stage of the proceeding, the defendant must, and does, rely upon the assertion that between 1925 and the present, and upon the pledge set forth in the bill of complaint, the Philippine government acquired a legal interest either in the securities or the proceeds of their sale, and that this suit cannot proceed in the absence of the Philippine government.

In cases involving transactions with national banks ultra vires the power of the bank, a distinction between the ability of the bank and the ability of the other party to the transaction to set up its ultra vires character has evolved. Compare Kerfoot v. Farmers' & Merchants' Bank, 218 U.S. 281, 31 S.Ct. 14, 54 L.Ed. 1042, and First National Bank of Xenia v. Stewart, 107 U.S. 676, 2 S.Ct. 778, 27 L.Ed. 592, with California Nat. Bank v. Kennedy, 167 U. S. 362, 17 S.Ct. 831, 42 L.Ed. 198 and McCormick v. Market Nat. Bank, 165 U.S. 538, 17 S.Ct. 433, 41 L.Ed. 817.

That the original attempt to effectuate a pledge was ultra vires is now indisputably settled by Texas & Pacific Railway v. Pottorff, 291 U.S. 245, 54 S.Ct. 416, 417, 78 L.Ed. 777, and City of Marion v. Sneeden, 291 U.S. 262, 54 S.Ct. 421, 78 L.Ed. 787. In Texas & Pacific Railway v. Pottorff, Mr. Justice Brandeis said:

"National banks lack power to pledge their assets to secure a private deposit. The measure of their powers is the statutory grant; and powers not conferred by Congress are denied. * * *

"The railway's argument is that the bank could not set up the defence of ultra vires since it had the benefit of the transaction; and that the receiver, as its representative, can have no greater right. Neither branch of the argument is well founded. The bank itself could have set aside this transaction. It is the settled doctrine of this court that no rights arise on an ultra vires contract, even though the contract has been performed; and that this conclusion cannot be circumvented by erecting an estoppel which would prevent challenging the legality of a power exercised. California Nat. Bank v. Kennedy, 167 U.S. 362, 17 S.Ct. 831, 42 L.Ed. 198; McCormick v. Market Nat. Bank, 165 U.S. 538, 17 S.Ct. 433, 41 L.Ed. 817; Central Transportation Co. v. Pullman's Palace Car Co., 139 U.S. 24, 11 S.Ct. 478, 35 L.Ed. 55. But even if the bank would have been estopped from asserting lack of power, its receiver would be free to challenge the validity of the pledge. * * *

"The receiver may assert the invalidity of the pledge without making restitution by paying the pledgee's claim in full. The railway's argument to the contrary is that when as a result of an ultra vires contract one of the parties is enriched at the expense of the other, the law creates an obligation to repay ex aequo et bono to the extent of the enrichment. The argument if applicable would not help the railway. Such claim under the doctrine of unjust enrichment is assimilated to an obligation of contract; and does not, in the absence of an identifiable res and a constructive trust based on special circumstances of misconduct, confer a preference over other creditors. The pledge here challenged having failed because illegal, the railway is entitled only to a dividend as a general creditor. Its right thereto is conceded."

From the above quotation it is clear that the pledges which the bank attempted to make were void. See Illinois Central R. R. Co. v. Rawlings (C.C.A.) 66 F. (2d) 146, 149; Utter v. Eckerson (C.C.A.) 78 F. (2d) 307, 310.

The defendant, in arguing that the Pottorff and Sneeden Cases are inapplicable, says, "In those cases it was held that a national bank had no authority to secure deposits and that *securities pledged* by a national bank to secure deposits might be re-

covered. Immediately the factual distinction becomes clear. · In those cases, *the pledged bonds had not been sold.* In the suits at bar on the contrary, *the pledged bonds have been sold* to a third party, and it is alleged that the proceeds of the sale were deposited to the credit of the Philippine Government with the defendant bank." (Defendant's italics.) The sale of the bonds having "executed" the pledge, the Philippine government acquired an interest in the proceeds.

In support of its distinction the defendant relies primarily on First National Bank of Xenia v. Stewart, 107 U.S. 676, 2 S.Ct. 778, 779, 27 L.Ed. 592. In that case, McMillan was indebted to the First National Bank of Xenia, and, to secure that indebtedness, turned over to the Bank certain securities, among which were some shares of the Bank's own stock. Section 5201 of the Revised Statutes (12 U.S.C.A. § 83), in effect, forbade a national bank to make a loan upon the security of its own stock. Upon nonpayment of the debt, the bank sold the securities and applied the proceeds upon account of the defaulted payment. After McMillan's death, his administrators sued the bank to recover the proceeds of the sale of the bank's stock. The Supreme Court denied recovery on two grounds: First, the contract was *executed.* In the court's own words:

"If, therefore, the prohibition can be urged against the validity of the transaction by any one except the government, it can only be done before the contract is executed, while the security is still subsisting in the hands of the bank. It can then, if at all, be invoked to restrain or defeat the enforcement of the security. When the contract has been executed, the security sold, and the proceeds applied to the payment of the debt, the courts will not interfere with the matter. Both bank and borrower are in such case equally the subjects of legal censure, and they will be left by the courts where they have placed themselves."

Applying this doctrine to the instant case, the defendant argues that the sale of the securities by the Secretary of War "executed" the contract between the bank and the Philippine government, and that thus the case is taken outside of the rule in the Pottorff and Sneeden Cases, where the defendant contends the contracts were still executory, and within the rule of the Xenia Case.

Suggestion may be made that the pledge in the instant case has not been "executed" within the scope apparently given that term in the Xenia Case, since the proceeds have not yet been applied to the payment of the debt. The true distinction, however, is that the pledgor in the Xenia suit had complete freedom of action in dealing with his stock, whereas in the case at bar the Bank's use of its assets was restricted and limited by the National Banking Act (12 U.S.C.A. § 21 et seq.) as construed by the Supreme Court in the Pottorff Case. This distinction is a derivative of the difference between a voidable transaction which can be ratified and a void transaction which is immune from ratification.

In the Xenia Case the court stated at page 678 of 107 U.S., 2 S.Ct. 778, 780, 27 L.Ed. 592:

"There is another view of this case. The deceased authorized the bank, in a certain contingency, to sell his shares. Supposing it was unlawful for the bank to take those shares as security for a loan, it was not unlawful to authorize the bank to sell them when the contingency occurred."

Thus, although the act was improper and exposed him to legal censure, McMillan had power to make the pledge. While the pledge should not have been made, McMillan had the capacity to authorize a sale of the illegally pledged stock. The ability to authorize a sale arose out of the underlying ability to make a pledge. The situation is different, however, in the case at bar. The complete want of power to make the pledge carried with it an incapacity to authorize a sale by any one for the purpose of "executing" the transaction. Nor could the act of the Secretary of War—an act which the bank was powerless to authorize—in attempting to execute the contract by selling the securities, create in him the authority he lacked. An abortive effort to make an agreement cannot transform the attempt into an accomplished fact.

Transmutation of the bank's property from one type of chose in action, viz., bonds, to another type, viz., a bank deposit, did not operate to vest an interest in the intended pledgee; it was a brutum fulmen. Indeed, the withholding of the securities illegally obtained might well be considered a conversion. Cotten v. Heimbecher (Tex.Civ. App.) 48 S.W.(2d) 402. In Farmers' & Merchants' State Bank v. Consolidated School District, 174 Minn. 286, 219 N.W. 163, 65 A.L.R. 1407, a suit to recover bank assets illegally pledged, the commissioner of banks sued in trover and recovered. See Maryland Casualty Company v. Board of Commissioners, 128 Okl. 58, 260 P. 1112,

where the proceeds of an invalid pledge were recovered. See, also, Blood v. Erie Dime Savings & Loan Co., 164 Pa. 95, 30 A. 362; Porter v. Canyon County Farmers' Mutual Fire Insurance Company, 45 Idaho, 522, 263 P. 632.

And even if it be assumed that in some manner the Secretary of War had legal authority to sell the securities, the defendant is in no better position. In First National Bank of Xenia v. Stewart, upon which the defendant relies, the court said, immediately following the portion last quoted:

"The shares being sold pursuant to the authority, the proceeds would be in the bank as *his* property. The administrators, indeed, affirm the validity of that sale by suing for the proceeds. As against the deceased, however, the money loaned was an offset to the proceeds. In either view the administrators cannot recover."

Thus, the court decided that the *proceeds* were McMillan's property against which the loan could have been applied. The point that McMillan's administrators were in no better position than he would have been is, of course, not relevant here in the light of the Pottorff Case which disallowed the defenses of estoppel and set-off. Providence Eng. Corp. v. Downey Shipbuilding Corporation (C.C.A.) 294 F. 641, is accordingly distinguishable. In relying upon Metropolitan Trust Company of New York v. McKinnon (C.C.A.) 172 F. 846, 849, the defendant fails to discern the fundamental distinction between a sale, where it is intended that title pass to the transferee, and a pledge, where it is intended that title remain in the pledgor-transferor. Furthermore, Judge Hand said: "The obligation of an ultra vires contract is void, whether executed or executory." To the extent that that case declares that any interest can be transferred by an ultra vires transaction, it must be held to be limited by the express statements in the Pottorff Case.

■ Thus, neither the intended pledge nor the sale of the securities gave the Philippine government an interest which renders its presence essential to the present proceedings.

■ The defendant also contends that in failing to annul section 625 of the Revised Administrative Code of the Philippine Islands, Congress in effect authorized the pledge involved here. This point is refuted by Springer v. Philippine Islands, 277 U.S. 189, 209, 48 S.Ct. 480, 72 L.Ed. 845; Miners' Bank v. Iowa, 12 How. 1, 13 L.Ed.

867; United States v. Bull, 15 Philippine R. 7.

The conclusions reached above make unnecessary any decision on the sovereign immunity of the Philippine government.

The defendant's motion is denied.

The plaintiff's motion to amend, the effect of which will be to clarify the issues before the court, is granted.