ADAMS, RECEIVER, *v.* CHAMPION, TRUSTEE IN BANKRUPTCY.

No. 374. Argued January 17, 1935.—Decided February 4, 1935.

*Mr. John F. Anderson*, with whom *Messrs. F. G. Awalt* and *George P. Barse* were on the brief, for petitioner.

*Mr. Harry C. Heyl* submitted for respondent.

By leave of Court, *Messrs. F. G. Awalt* and *George P. Barse* filed a brief on behalf of the Comptroller of the Currency, as *amicus curiae*.

MR. JUSTICE CARDOZO delivered the opinion of the Court.

A trustee in bankruptcy asserts a claim against the receiver of a national bank for the value of property received by the bank as an unlawful preference. The receiver admits the validity of the claim if it is placed upon the same level as the claims of creditors at large. The trustee insists that the claim must have priority on the ground that the avails of the unlawful preference are subject to a trust.

In September, 1928, the bankrupt, John Fitzgerald, had overdrawn his deposit account with the Farmers National Bank of Pekin, Illinois, and was also indebted to the bank upon promissory notes. In response to a demand for collateral security he delivered to the bank notes of other persons, as well as a certificate of stock, the whole of the face or par value of about $35,000. Most of the securities so delivered have been returned to the trustee and are not in controversy now. Four items only are the subject of this suit.

The bank received from Fitzgerald on September 7, 1928, a certificate for ten shares of its own stock, a promissory note of Charles Graff for $3,000, a promissory note of W. C. Sommer for $1,000, and notes or bonds of Veesaert for $5,000, reduced later by $1,597.31 paid upon account. Within a period of four months (on October 26, 1928), creditors of Fitzgerald filed a petition in bankruptcy, an adjudication following in November of that year. No election was made by the trustee in bankruptcy to reclaim the collateral as an unlawful preference till July 20, 1929, or if there was an earlier election, it is not shown by the record. In the meantime the bank, which continued as a going concern until January, 1932, had disposed of three of the contested items of security as follows: On February 9, 1929, after having credited the bankrupt with a dividend of $30, it sold the ten shares of its own stock to one Cullinan, a depositor. The price was $3,000, by concession the fair value. Payment was effected by charging the deposit account of the purchaser with what was owing for the shares. On April 12, 1929, the bank collected $3,183.78 upon the note of Charles Graff by charging that amount against the deposit balance to his credit. On April 16, 1929, it collected $1,059.98 upon the note of W. C. Sommer by a charge against his balance. Nothing was received upon the Veesaert bonds, the fourth contested item, till December,

1930. The bank then had a payment on account to the extent of $1,597.31, the payment being made by the deposit of a check to its credit in the First National Bank of Chicago, Illinois. The balance in that account was afterwards reduced to $776.57, which latter amount, together with the bonds themselves, the receiver stands ready to transfer to the trustee.

The election by the trustee to reclaim the collateral securities in behalf of the estate was announced, as we have seen, on July 20, 1929, and was manifested by the beginning of a suit for appropriate relief. No charge was made that the transaction was voidable for any actual fraud. The suit was under § 60b of the National Bankruptcy Act (11 U. S. C. § 96) upon the ground that the effect of the transaction was to prefer one creditor over others, and that the creditor, the bank, had reasonable cause to believe that such effect would follow.* Under *Schoenthal* v. *Irving Trust Co.*, 287 U. S. 92, an action at law could have been maintained for the recovery of the property or its value. Without objection, however, the suit was tried in equity. Cf. *Buffum* v. *Peter Barceloux Co.*, 289 U. S. 227, 235. It ended on June 24, 1932, in a decree invalidating the transactions of September 7, 1928, as constituting a forbidden preference, and directing the return of the securities, or the value of such as had been converted into money.

During the years of litigation the bank had suffered reverses, and on January 8, 1932, it was closed by the

---

* " If a bankrupt shall . . . have made a transfer of any of his property, and if, at the time of the transfer, . . . and . . . within four months before the filing of the petition in bankruptcy . . . the bankrupt be insolvent and the . . . transfer then operate as a preference, and the person receiving it or to be benefited thereby, or his agent acting therein, shall then have reasonable cause to believe that the enforcement of such . . . transfer would effect a preference, it shall be voidable by the trustee and he may recover the property or its value from such person. . . ." § 60b; 11 U. S. C. § 96.

Comptroller of the Currency. The receiver appointed by the Comptroller was not a party to the suit to invalidate the preference. After the entry of a decree, the trustee in bankruptcy petitioned for an order instructing the receiver that the four contested items were a preferred charge upon the assets, and that payment should be made accordingly. The District Court granted the relief prayed for, and upon appeal to the Court of Appeals for the Seventh Circuit the order was affirmed. 70 F. (2d) 956. A writ of certiorari issued from this court.

If we except a small item conceded by the receiver, we think the reasons are inadequate for the imposition of a trust in the nature of a preference upon the funds of this insolvent bank.

1. For convenience the first of the contested items, the proceeds of the stock certificate, will be considered by itself, the conclusion appropriate for this item being typical of the conclusion appropriate for the others.

The acceptance by the bank of the certificate delivered by Fitzgerald on September 7, 1928, was not a wrongful act whereby the bank forthwith became subject to the duties and liabililties of a trustee *ex maleficio*. One who acquires a security with reasonable cause to believe that the effect will be a preference does not from that alone become a party to a fraud. *Van Iderstine* v. *National Discount Co.*, 227 U. S. 575, 582; *Watson* v. *Adams,* 242 Fed. 441, 444, 445; *Dean* v. *Davis,* 242 U. S. 438, 444; *Keppel* v. *Tiffin Savings Bank,* 197 U. S. 356; *Carson* v. *Federal Reserve Bank,* 254 N. Y. 218, 234; 172 N. E. 475. If bankruptcy is averted altogether, or postponed beyond four months, the security will stand, though a preference was intended at the time of its acceptance. So also a change of assets or liabilities before bankruptcy arrives may mean the difference between a preference and a ratable division. *Haas* v. *Sachs,* 68 F. (2d) 623; *Irving Trust Co.* v. *Townsend,* 65 F. (2d) 406, 408; *Mansfield*

*Lumber Co.* v. *Sternberg,* 38 F. (2d) 614, 617; *Rogers* v. *Page,* 140 Fed. 596, 606; *In re Henry C. King Co.,* 113 Fed. 110, 111; *Rubenstein* v. *Lottow,* 223 Mass. 227, 229, *et seq.;* 111 N. E. 973. The bank took the risk that in future and indeterminate contingencies it might be compelled to return what it accepted or the value. At the outset it was not a trustee *ex maleficio* or otherwise. It was a bailee and nothing more.

If a trust was not created in September, 1928, through the acceptance of a security which has turned out to be a preference, none was in existence on February 9, 1929, when part of that security, the certificate of stock, was delivered to a purchaser. True, by that time the debtor was in bankruptcy, but the other uncertainties, for anything here shown, were as indefinite as ever. The accurate determination of assets and liabilities had still to wait upon the process of proof and liquidation. At most the security was voidable, not void, and the trustee up to that time had made no move to avoid it. A suit would have been a sufficient election, even though not preceded by a demand (*Eau Claire National Bank* v. *Jackman,* 204 U. S. 522, 534, 535; *Stephens* v. *Pittsburgh Plate Glass Co.,* 36 F. (2d) 953), but as yet there had been no suit, nor statement that a suit was coming. To turn the bank into a wrongdoer in the absence of actual fraud, to charge it with all the liabilities growing out of a constructive trust, there was need of some act of avoidance that would put the brand of guilt upon it. Cf. *Boyd* v. *Dunlap,* 1 Johns. Ch. 478, 482, per Kent, Ch. We hear of no such act till July, 1929, when the trustee in bankruptcy brought suit to declare the preference a nullity.

The sale of the stock certificate to Cullinan on February 9, 1929, must be approached and considered in the light of the relation then existing. There was then no

trust *ex maleficio,* whereby the bank was chargeable as a wrongdoer for parting with the shares. There was no trust implied in fact, unless it be the fiduciary obligation assumed by a bailee to act with prudence and fidelity in the disposition of the pledge. The trustee does not assert that this obligation has been violated. On the contrary he concedes that the price was equal to the value. With its duty thus defined and measured, the bank agreed with Cullinan to accept payment of the price by canceling to an equivalent extent the debt due him as a depositor. Cf. *Jennings* v. *United States Fidelity & Guaranty Co., ante,* p. 216; *Old Company's Lehigh, Inc.* v. *Meeker, ante,* p. 227. We do not need to consider whether effect would be given to such an agreement according to its form if the bank at that time had been under a present duty to set up a trust as to the proceeds to the use of the bankrupt or of the trustee as his successor. For the purposes of this case we assume, though we do not hold, that a trust in that event would attach to the cash assets in the vaults to an equivalent amount. A different result follows when there is neither trust to be set up nor wilful wrong to be repaired. The bank, when it parted with the certificate, had a solvent, going business, and did not make the transfer with any fraudulent or obstructive purpose. There is no reason in such circumstances why the transaction should be treated retrospectively as something other than it was meant to be. *Jennings* v. *United States Fidelity & Guaranty Co., supra.* Equity fashions a trust with flexible adaptation to the call of the occasion.

Other remedies were at hand sufficient for the needs of justice. When the preference was avoided, the bank became chargeable like any common law debtor with a duty of restitution to the extent of the value of the property disposed of. There might even be a duty, if the proceeds

were intact, to make return *in specie*. But what is here sought is very different. By a process of analysis a unitary transaction, the cancellation of a debt to a depositor, is treated as if split up into two parts, a fictitious withdrawal by the depositor of coin or other currency, and its return to the bank to be applied upon the purchase. The money so returned is then subjected to a trust and though mingled with other money is viewed as retaining its identity so long as any portion of the fund is discovered to be intact. These fictions and presumptions may serve well enough in their application to one whose act is against equity and conscience at the time of its commission. They may be implements of justice in cases of theft or actual fraud. So, at least, we now assume. In circumstances less flagrant, they will be used more charily. They will not be so applied as to impose a trust by relation upon moneys that have entered into " the stream of the firm's general property " (Holmes, J., in *National City Bank* v. *Hotchkiss,* 231 U. S. 50, 57), and are distinguishable no longer.

For nearly three years after the sale of this stock, the situation stood unchanged. An adequate remedy against the bank through the recovery of an ordinary money judgment belonged to the trustee continuously, and this whether the award of the value was to be at law or in equity. *Schoenthal* v. *Irving Trust Co., supra; Buffum* v. *Peter Barceloux Co., supra.* There was no attempt during those years to separate the proceeds of the sale from other assets through an injunction or a receivership, nor any hint of a desire to charge a trust upon the proceeds. Not till the suit was at an end and the bank was in the hands of the Comptroller of the Currency did the respondent shift his theory and turn a debt into a trust. By that time new duties had arisen, new interests had intervened. The assets of the bank were now

held by the receiver upon a trust for equal distribution. Cf. *Wisdom* v. *Keen*, 69 F. (2d) 349, 350; *Fera* v. *Wickham*, 135 N. Y. 223, 230; 31 N. E. 1028; *Gerseta Corp.* v. *Equitable Trust Co.*, 241 N. Y. 418, 425; 150 N. E. 501. The shift had come too late.

2. What has been said as to the sale of the stock certificate to Cullinan applies with equal force to the second and third of the contested items, the Graff and Sommer notes.

The collections on these notes were made in April, 1929. They were made, not in cash received over the counter, but by cancellation of a debt owing to the makers upon their deposit balance in the bank. There was neither trust, nor claim of trust, until the bank had suspended, and was in the hands of a receiver.

3. The fourth contested item, the collection on the Veesaert bonds, differs from the others in that the payment was received after the trustee in bankruptcy had elected to avoid the preference and had sued for that relief.

The payment was made as we have seen, by the deposit of $1,597.31 in the First National Bank of Chicago, Illinois.

The balance in that account was reduced in 1931 to $776.57. What became of the difference ($820.74) there is nothing to inform us. Evidence is lacking that it was withdrawn in such a form or for such purposes as to be represented by any assets forming part of the estate today. The receiver consents that this item of $776.57, the balance in the Chicago bank, be paid to the respondent as a preferred charge upon the fund.

The decree is reversed and the cause remanded for further proceedings in accordance with this opinion.

*Reversed.*