In re GRIGSBY–GRUNOW, Inc.

PARADISE v. McKEY.

Nos. 5498, 5499.

Circuit Court of Appeals, Seventh Circuit.

Dec. 7, 1935.

Stanford Clinton, of Chicago, Ill., for appellant.

A. L. Schapiro and Bernard C. Schiff, both of Chicago, Ill., for appellee.

Before EVANS and SPARKS, Circuit Judges, and BRIGGLE, District Judge.

EVANS, Circuit Judge.

These appeals were taken from an order entered in the Grigsby-Grunow bank-

ruptcy proceedings which disallowed preference to a claim presented by the trustee of an employees' welfare association, appellant herein. Bankrupt, prior to its adjudication, employed three thousand persons. They all belonged to an association which had for its objective the development of harmonious relations between bankrupt and its employees and the providing of accident and health insurance for the latter. Bankrupt charged each employee a membership fee of one dollar and deducted twenty-five cents each week from the employee's wage. These sums, after certain expense deductions, were turned over to the association to be invested solely in United States Government bonds and to be used for the aforementioned purposes. Bankrupt deducted the twenty-five cents per week from the wages of each of its employees and charged itself with the said amount and at the same time turned the money over to the welfare association. This practice was followed for some time, but, after February 4, 1933, it neglected to pay all of the funds which it deducted from the wages of its employees to the treasury of the welfare association. When the petition in bankruptcy was filed, it held $14,-607.51 of such moneys.

The referee to whom the matter was referred made findings upon which he allowed the claim as a preferential lien against the assets of the estate. On review, the District Court reversed this order and appellant's claim was allowed as a general, but not as a preferred claim.

We quote from the findings of the referee, which are not attacked:

"On February 4, 1933 and prior thereto, the bankrupt maintained in connection with its business, an unincorporated organization known as the 'Majestic Employees Welfare Association,' which had been formerly known as the 'Majestic Employees Welfare and Athletic League.' The Association's purpose was to provide life, health and accident insurance for the benefit of the employees of the bankrupt and their dependents. The Association was governed by its own officers and directorate and maintained its own account in the First National Bank of Chicago. The funds of the Association were invested exclusively in obligations of the United States Government and the earnings and increment of these investments were used for the insurance benefits contemplated by the Association's constitution and by-laws.

"The membership of the Association was comprised exclusively of employees who had been employed for thirty days or more and who had paid the initial fee of $1.00 to the treasury of the Association. The initial fee was automatically deducted by the bankrupt from the amount due as salary or wages of each employee, employed for the required period. In addition to the initial fee there were weekly dues of 25c per week, which were likewise automatically deducted by the bankrupt from the amount due each member as salary or wages.

"Prior to February 4, 1933, the bankrupt regularly paid the Association by check which was deposited in its treasury, the accumulations of each payroll deduction, less deductions for expenses of the Association paid by the bankrupt. Commencing with February 4, 1933, however, the bankrupt began to fall in arrears, and from that time until November 24, 1933, when the Receivers in Equity were appointed for the bankrupt, there was always a balance to the credit of the Association, which it had not paid to the Association. On November 24, 1933 said balance was in the sum of $14,607.51. The deductions of 25c per week, including deduction for the initial fee, were made by charging the employee's account on the payroll records of the bankrupt and crediting the aggregate of all such deductions to the account of the Majestic Employees Welfare Association on the books of the bankrupt. No actual money was taken from the pay envelopes of the employees and deposited in any account of the bankrupt, but to the contrary the matter was handled as a mere bookkeeping entry and at no time did the Grigsby-Grunow Company segregate any money due the Majestic Employees Welfare Association or deposit any money in any separate trust account or bank account.

"On or about August 12, 1933, the Majestic Employees Welfare Association was formally dissolved and disbanded. * * *

"After setting up a fund of some $2,-750.00 to cover certain contingent obligations of the Association, all the other assets were conveyed, by apt resolution, to the Majestic Works Council. The Works Council, like the Association, was an unincorporated organization in which the bankrupt and its employees had equal representation. All employees of the bankrupt were members of the Works Council. The Works Council had for its objective

harmonious relations between the bankrupt and its employees and conferred numerous benefits upon the employees.

"* * * A claim was filed in the equity receivership case by Maurice Paradise, as Trustee, the petitioner herein, for the payment of $14,607.51 to the Works Council. However, the moneys were never paid. * * *

"The practice of the bankrupt was to deposit all of its incoming revenue in its general bank account, from which it would from time to time withdraw moneys and establish various special accounts. The bankrupt was accustomed to withdraw from its general account or special accounts as the convenience of the situation required, and the payroll was drawn from the various accounts, both general and special, indiscriminately."

Whether a constructive trust was created in appellant's favor must be determined by the legal effect of the bankrupt's acts. The following, taken from the stipulated facts, is well-nigh controlling:

"* * * In addition to the initial fee there were weekly dues of 25¢ per week, which were likewise automatically deducted by the bankrupt from the amount due each member as salary * * *.

"Prior to February 4, 1933, the bankrupt regularly paid the Association by check which was deposited in its treasury, the accumulations of each payroll deduction, less deductions for expenses of the Association paid by the bankrupt. Commencing with February 4, 1933, however, the bankrupt began to fall in arrears, and from that time until November 24, 1933, when the Receivers in Equity were appointed for the bankrupt, there was always a balance to the credit of the Association, which it had not paid to the Association. On November 24, 1933, said balance was in the sum of $14,607.51. The deductions of 25¢ per week, including deduction for the initial fee, were made by charging the employee's account on the payroll records of the bankrupt and crediting the aggregate of all such deductions to the account of the Majestic Employees Welfare Association *on the books of the bankrupt.*"

Such transactions, we think, resulted in the creation of a trust, a constructive trust, a trust ex maleficio, which was fastened upon the bankrupt irrespective of its intention. When it deducted the twenty-five cents per week and the one dollar initiation fee, it was under obligation to turn the same over to the Majestic Employees Welfare Association. This it did for several years. But, with failure and bankruptcy confronting it, resort was had, as is so frequently the case, to subterfuge—to an attempt to despoil or dispossess those whose numbers were many and whose individual interests were small. Instead of turning over to the welfare association the money deducted from the employees' wages, the bankrupt converted it to its own use. It credited itself with the payment of the amount and yet retained the said sum in its own treasury. This was a conversion.

The turning point in the case is the transaction whereby bankrupt, indebted to individual employees for wages, took the same and satisfied its indebtedness to them and then failed to turn the money over to the beneficiary. Bankrupt's right to credit itself with the unpaid wages was dependent upon its payment of said sum to the welfare association.

What bankrupt did was to take the money, the amount of which was the unpaid wages of its employees, from one pocket and transfer the same money to another pocket, and to announce, in legal effect, that in this sum it was now indebted to the welfare association. It should have *paid* it to the association. It was guilty of conversion when it did not do so. The legal effect of such transaction was to make it a trustee ex maleficio. Bankrupt did not notify either party (employees or welfare association) of the transaction. It is true there was little or no difference in the two entities, the employees and the welfare association. But there was some—sufficient to make them separate entities. Only through accident, ill health or some other cause would an employee share in the benefits. For all practical, as well as legal consequences, therefore, the welfare association was an entity distinct from the employees whose wages created the fund out of which the welfare association paid its benefits.

Such a trust so created (a constructive trust, a trust ex maleficio) will not fall though other dollars may take the place of the original ones received when the employees made their contribution to the fund. "Dollars are fungibles and any one of them will be accepted as a substitute for another." Jennings v. U. S. F. & G. Co., 294 U.S. 216, 224, 55 S.Ct. 394, 397, 79 L.Ed. 869, 99 A.L.R. 1248.

The record shows there were at all times sufficient moneys in the bank deposits of the bankrupt to pay the amount due the welfare association.

It seems we have a case where A, the employees of B, consented to B's taking a certain amount each week from their wages and turning it over to a charitable organization, C, for the purpose of creating a fund to be managed and distributed by C among its ailing members. B deducted the money which A agreed might be deducted. After deduction, however, instead of B's delivering the money to C, B kept the money.

A somewhat similar situation is discussed in Adams v. Champion, 294 U.S. 231, 238, 55 S.Ct. 399, 402, 79 L.Ed. 880, where it is said:

" * * * By a process of analysis a unitary transaction, the cancellation of a debt to a depositor, is treated as if split up into two parts, a fictitious withdrawal by the depositor of coin or other currency, and its return to the bank to be applied upon the purchase. The money so returned is then subjected to a trust and though mingled with other money is viewed as retaining its identity so long as any portion of the fund is discovered to be intact. *These fictions and presumptions may serve well enough in their application to one whose act is against equity and conscience at the time of its commission.* They may be implements of justice in cases of theft or actual fraud. So, at least, we now assume."

In the instant case, however, unlike that discussed in Adams v. Champion, supra, or in Jennings v. U. S. F. & G. Co., supra, there was not even the "unitary transaction." We do not have two parties dealing with one another—a depositor and a bank—out of whose transactions an implied relationship is assumed, but we have employees and an employer dealing with each other, the former creating a fund for the benefit of C, a third party. The employer's indebtedness to the employees was satisfied only upon employer's delivering the money to the third party, C. In carrying out this transaction employer credited itself, as against the employees, with having made the payment to C. As a matter of fact it did not make the payment to C, but converted the money to its own use. Under these circumstances we see no escape from the conclusion that a constructive trust, a trust ex maleficio, was created. The employer was a wrongdoer, a converter, from the moment it credited itself in full for payment of the employees' wages.

Some of the decisions upon which appellee relies must be distinguished on the ground that the party sought to be held as trustee was a national bank. Now, it is apparent that between a depositor and a bank, a well-nigh universal experience has resulted in the recognition of the status of the depositor and the relationship that exists between depositor and the bank. It is that of debtor and creditor. National bank statutes and the regulations of the National Banking Department governing the liquidation of insolvent banks are confirmatory of this relationship. Jennings v. U. S. F. & G. Co., supra; Adams v. Champion, supra; Old Company's Lehigh, Inc., v. Meeker, Receiver et al., 294 U.S. 227, 55 S.Ct. 392, 79 L.Ed. 876.

A depositor who draws a check in favor of a bank with instructions to buy a security understands the position he occupies. It is that of a creditor until the security is possessed by the bank. If a different status is desired, special instructions and deposits are necessary. Jennings v. U. S. F. & G. Co., supra; Adams v. Champion, supra. If a depositor gives the bank a check against his account, with which to buy a bond, it is well understood that the debtor-creditor relationship extends as to this, as well as to the deposit transactions. Custom has given character to the transaction.

In the case of an employee who is seeking, or who has been compelled by his employer, to create a fund out of which sickness benefits may be paid to ailing employees, quite a different understanding arises. Unlike the bank depositor's situation, the employee has nothing to do with the withholding of his wages or its payment to the beneficiary company. He does not know of its payment or of its conversion, if any there be. He relies on his employer. He knows that his employer has the authority to withhold part of his wages and that he has done so. He also knows that the deduction of part of his wages is permissible only if the employer turns the same over to the welfare association. He does not know whether this has been done. There is no understanding—no implied agreement that the employer may hold the money indefinitely or otherwise and become a debtor of the welfare association. A contrary understanding exists, namely, that the

employer must turn the money over to the welfare association immediately upon its deduction from the employee's wages. Failure to do so makes it a wrongdoer. Against such a wrongdoer and to protect the contributor, equity fastens a trust upon the transgressor and holds him as a trustee ex maleficio.

■ Such a trust, equity will follow even though there has been a commingling of the trust fund with private accounts. Jennings v. U. S. F. & G. Co., 294 U.S. 216, 226, 55 S.Ct. 394; Knatchbull v. Hallett, 13 Ch.Div. 696; Gorman v. Littlefield, 229 U. S. 19, 33 S.Ct. 690, 57 L.Ed. 1047; Standard Oil Co. v. Hawkins (C.C.A.) 74 F. 395, 33 L.R.A. 739.

■ It cannot be doubted, it is true, but that the wrongful action of the bankrupt might have been ratified by the welfare association. The latter's right against the bankrupt for conversion might have been waived and the bankrupt's action might have been ratified. In such case the relation of debtor and creditor and not that of trustee and cestui que trust would have arisen. We find nothing in the record before us however that would support a finding that the bankrupt's retention of the money was agreed to or acquiesced in by the welfare association. A contrary deduction is unavoidable. The articles of the welfare association called for the investment of all of its funds in Government bonds. This negatived any possibility that the same might be loaned to employer. It also appears that the welfare association demanded payment of the sum due it. Neither the employees nor the welfare association knew the facts. The employees did not know whether the money had been turned over to the welfare association or not. The welfare association did not know how much had been deducted from the employees' wages. It is elementary that no waiver of rights or ratification of wrongful actions can occur without knowledge of the facts.

Another approach to these facts and another syllogism lead to the same conclusion.

■ From acts and words, as well as from express agreement, the status of trustee may be created. Bogert on Trusts, volume 1, § 45, p. 197, states the rule as follows:

"The relationship of the parties, followed by acts affecting title and possession, may lead a court to imply a trust intent as actually existing and as having been expressed, although no words referring to a trust or trustee have been spoken or reduced to writing. In the creation of trusts settlors have never been handicapped by formalism. They have not been required to express their intention to create a trust in set phrases or words. * * *"

■ In the instant case the parties did not use the words "trust," "trustee," and "cestui que trust," but they dealt with one another in such a way, with respect to moneys which the employer held for the employees and later for the welfare association as to point directly to the existence of an implied trust. That is to say, the parties understood that the employer was to pay the twenty-five cents per month deducted from the employees' wages to the welfare association. Until the payment was made, however, it was to hold the money in trust for such welfare association. The obligation of the trustee terminated when payment was made.

This conclusion seems to be an irresistible one resulting from the consideration of the agreed facts and acts and the necessary inferences which arose therefrom. The intention of the parties governs. Agreements informally reached, the details of which are frequently established by action, at times leaves the question of intent somewhat in doubt. At other times the object of the transaction and the acts of the parties speak even more persuasively than oral testimony and almost as effectively as formal but unintelligently prepared written agreements. Considering the purpose of this agreement and all of the surrounding circumstances, it seems to us that the parties intended the wages withheld by the employer should be held by it as trustee until payment was made to the welfare association.

The decree is reversed with directions to enter one in accordance with the views here expressed.