**BRADFORD v. CHASE NAT. BANK OF CITY OF NEW YORK, and five other cases.**

District Court, S. D. New York.
June 28, 1938.

On Settlement, etc., July 18, 1938.

30

Conboy, Hewitt, O'Brien & Boardman, of New York City (Martin Conboy and John Vance Hewitt, both of New York City, Brice Clagett and George B. Springston, both of Washington, D. C., G. Ridgely Sappington, of Baltimore, Md., and Hugh H. Obear and George P. Barse, both of Washington, D. C., Gen. Counsel to the Comptroller of the Currency, of counsel), for plaintiffs.

Mudge, Stern, Williams & Tucker, of New York City (Henry Root Stern, George L. Trumbull, and Donald Kehl, all of New York City, of counsel), for defendant.

Eugene M. Caffey, of Washington, D. C., of the Judge Advocate General's Office, United States Army, of counsel to the Secretary of War, appearing specially as amicus curiæ.

WOOLSEY, District Judge.

My judgment in this consolidated cause is that the several complaints here involved be dismissed with costs, with will include taxable disbursements divided equally as against the several plaintiffs.

I. My substantive jurisdiction in so far as the national banks are concerned is based on the fact that the suits which are here involved are suits for winding up the affairs of national banking associations—Title 28 United States Code, Section 41, subdivision (16), 28 U.S.C.A. § 41(16). Cf. Pufahl v. Parks' Estate, 299 U.S. 217, 225, 57 S.Ct. 151, 156, 81 L.Ed. 133—and as a consequence thereof would not fall within the ambit of the decision of the Supreme Court in Erie Railroad Company v. Tompkins, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, rendered on April 25, 1938; Cf. Downey, Receiver, v. City of Yonkers, D.C.S.D.N.Y., 23 F.Supp. 1018, an opinion by Judge Knight, dated June 8, 1938, and made in a case which

he heard whilst sitting by assignment in this District.

The basis of my substantive jurisdiction of the cause of the Baltimore Trust Corporation is diversity of citizenship, because it is a suit involving more than $3,000 exclusive of interest and costs between a Maryland corporation and the Chase National Bank of the City of New York, hereinafter called the Chase Bank, which has its principal banking office in New York City, in the State of New York, and which is, consequently, to be regarded as domiciled therein and a citizen thereof. Title 28 United States Code, Section 41, subdivision (16), 28 U.S.C.A. § 41 (16); United States v. Campbell; D.C., 5 F.Supp. 156, 165, 166, affirmed Campbell v. Chase Nat. Bank, 2 Cir., 71 F.2d 669, 94 A.L.R. 708.

There is not any challenge as to the locus standi of the several plaintiffs in the several constituent suits or to the venue in which the suits were brought.

II. In view of the decisions of the United States Supreme Court on April 25, 1938, in Interstate Circuit, Inc., et al. v. United States, and Paramount Pictures Distributing Co., Inc., v. United States, 58 S.Ct. 768, 82 L.Ed. 1146, it is now a work of supererogation to write a considered opinion in an equity cause, for its place will be taken by formal findings of fact and conclusions of law, separately stated, under Equity Rule 70½. Title 28 United States Code, Section 723, 28 U.S.C.A. § 723.

I am contenting myself in this interesting case, therefore, with merely summarizing the facts and stating my conclusions of law.

III. The facts are not seriously in dispute and the argument thereon is largely a question of inference and emphasis.

A. As many of the uncontroverted facts are stated in the amended complaints, it will tend to brevity if I make a summary of those complaints and supplement it by making a few findings of facts which the plaintiffs did not include therein.

Briefly stated the complaints allege:

That the banks and trust company of which the plaintiffs are receivers or liquidators were the owners of certain bonds which were pledged to secure deposits of public moneys of what was at the time of such deposits known as the Government of the Philippine Islands;

That the officers of said banks and trust company, without authority in law, delivered possession of bonds severally owned by them and pledged as aforesaid to the persons who were at the times of such pledges the Secretary of War or the Chief of the Bureau of Insular Affairs in the War Department, or to their nominees;

That the bonds were pledged and delivered for the purpose of securing certain deposits of the public funds of the Government of the Philippine Islands—hereinafter called the Philippine Government, and now superseded by the Commonwealth of the Philippine Islands—made in the particular bank in question to the credit of the Treasurer of the Philippine Islands;

That the deposits were not the kind of deposits which could be secured by a pledge of the bank's assets and that the attempted pledge was both ultra vires and forbidden, and so was absolutely void and of no effect;

That, accordingly, the several banks here involved continued to be the legal owner and entitled to immediate possession of the bonds on demand;

That thereafter when the banks became insolvent, and were closed, and the plaintiff was appointed receiver or liquidator as the case may be, the Secretary of War or the Bureau of Insular Affairs caused the bonds to be sold, and the said receiver or liquidator thereupon became entitled to the proceeds and that the said proceeds were, notwithstanding the fact that the receiver or liquidator was entitled to them, paid over to the defendant, the Chase Bank, by the Bureau of Insular Affairs;

Plaintiffs, alleging that they have not any plain adequate remedy at law,—in addition to the usual interlocutory prayers —pray for an accounting of the funds so deposited and as their principal relief pray—

"That a decree be entered by this Court adjudging that the aforesaid funds held by said defendant, as aforesaid, belong to and are impressed with and subject to a trust in favor of the plaintiff and that the said The Chase National Bank of the City of New York be ordered and directed to pay said funds to the plaintiff together with the dividend and interest."

B. I find that the funds deposited as above stated were credited by the Chase Bank on instructions from the Philippine

Government—usually given through the Bureau of Insular Affairs—to such of the fourteen accounts of the Treasurer of the Philippine Islands in the Chase Bank as might be indicated when the deposit was sent on to it.

These accounts were captioned as follows:

1. Treasurer of the Philippine Islands —Treasury Certificate Fund Account—Demand Deposit.

2. Treasurer of the Philippine Islands —Public Improvement Bonds Account Act, 2940—Demand Deposit—Bureau of Insular Affairs, Washington D. C.

3. Treasurer of the Philippine Islands —Sundry Sinking Fund Account—Demand Deposit—Bureau of Insular Affairs, Washington, D. C.

4. Treasurer of the Philippine Islands —General Fund Account—Demand Deposit.

5. Treasurer of the Philippine Islands —Gold Standard Fund Account—Demand Deposit.

6. Treasurer of the Philippine Islands —Teachers Pensions & Disability Fund Account—Demand Deposit.

7. Treasurer of the Philippine Islands —Financial Interest Protection Bond Fund Account—Demand Deposit.

8. Treasurer of the Philippine Islands —Property Insurance Fund Account—Demand Deposit.

9. Treasurer of the Philippine Islands —Land Title Assurance Fund Account—Demand Deposit.

10. Treasurer of the Philippine Islands—Special Account Bank of the Philippine Islands Circulating Notes Redemption Fund Account No. 3330—Demand Deposit.

11. Treasurer of the Philippine Islands—Special Account National Bank Circulation Notes Reserve—Demand Deposit.

12. Treasurer of the Philippine Islands—Philippine Government Public Funds—Demand Deposit.

13. Treasurer of the Philippine Islands—Gold Standard Fund Account—Time Deposit.

14. Treasurer of the Philippine Islands—Special Account Philippine National Bank Circulating Notes Reserve Fund Account No. 3174—Time Deposit.

C. I find that these accounts are now in the possession of the Commonwealth of the Philippine Islands—hereinafter called the Philippine Commonwealth—a sovereignty which succeeded the Government of the Philippine Islands on November 15, 1935, in pursuance of the Philippine Independence Act. Title 48 United States Code, Sections 1231–1247, 48 U.S. C.A. §§ 1231–1247.

D. I find—

That the pledged bonds were sold with the consent of the receiver or liquidator of each bank, and also with the consent of the Comptroller of the Currency in the case of the national banks, and of the Banking Commissioner of Maryland in the case of the Baltimore Trust Company;

That if the sale price of the pledged bonds exceeded the deposit of the Philippine Government in any of the banks here involved, the excess was duly remitted by the Bureau of Insular Affairs to its receiver or liquidator; and

That, in the Bradford and Hardee cases, the proceeds of the bonds were not equal to the deposit balance of the Treasurer of the Philippine Islands, and that this deficiency was paid, as is alleged under mistake of law, in cash by the receiver of each of those two banks after the bonds were sold.

E. Thus there was achieved in each case what the Philippine Government considered was a final settlement with the receivers or liquidators of the plaintiff banks in respect of its several secured deposits.

These settlements are claimed by the plaintiffs to be so tinctured with the original ultra vires nature of the pledges as to be wholly void.

F. Whilst the plaintiffs' demand is for the entire traceable proceeds of the bonds, and of these alleged preferential payments in the two cases I have mentioned, to avoid circuity of action and to prevent any attempt to tie up the funds of the Philippine Commonwealth, "without prejudice" agreements have been made to limit any recovery in each case to the difference between the plaintiffs' claims and the amount of all liquidating dividends which may have been declared to the date of trial or may be declared hereafter, and to which the Philippine Government would be entitled as general creditor of the several banks.

Thus the Philippine Commonwealth, in event of recovery herein, would be demoted from the status of a secured to that of a general creditor.

IV. In the four suits brought by the receivers of national banks, Judge Knox had before him motions reported under the name of Baldwin v. Chase National Bank, D.C., 1936, 16 F.Supp. 918[1] to dismiss the case, on the ground that the Philippine Commonwealth was an indispensable party to the suits.

Judge Knox posed, 16 F.Supp. at page 919, the two questions before him as follows:

"(1) Is the Philippine government an indispensable party?

"(2) If it is indispensable, can it be brought into this case?"

In 16 F.Supp. at page 920, Judge Knox, after discussing the problem of who was an indispensable party to a suit, said:

"Hence in the instant case the court at the outset must decide, for *jurisdictional purposes alone,* whether the Philippine government has an interest which makes it an indispensable party."

Judge Knox came to the conclusion that the Philippine Commonwealth was not an indispensable party to these suits because the pledges of the assets of the bank were void and that, therefore,

"Transmutation of the bank's property from one type of chose in action, viz., bonds, to another type, viz., a bank deposit, did not operate to vest an interest in the intended pledgee. * * *

"Thus, neither the intended pledge nor the sale of the securities gave the Philippine government an interest which renders its presence essential to the present proceedings." Pages 922, 923.

He, therefore, did not deal with the second question, namely, whether the Philippine Commonwealth was a sovereign state not amenable to process in respect of property in its possession.

 Judge Knox thus fixed the law of the case for me on such questions as were properly before him on the motions, and, promoting an orderly administration of justice, I must not, unless the facts are changed by the trial, make any ruling which would contravene his order allowing the case to proceed without the Philippine Commonwealth as a party on the grounds which he stated. Cf. Potts v. Village of Haverstraw, 2 Cir., 93 F.2d 506.

Therefore, I must consider that the pledges made by the several banks to the Philippine Government were void because they were ultra vires.

But it should be remembered in this connection that the decision of Judge Knox is the law of the case only in the suits which were before him on the motions above mentioned—namely, the suits by the four receivers of national banks.

For reasons of comity I apply the decision of Judge Knox to the Feucht Case because it also involves a national bank.

In the Baltimore Trust Corporation case, however, there is not any law of the case applicable, nor does Judge Knox' decision, which dealt only with national banks, apply to a trust company or its constituent banks formed under Maryland law. Consequently, I am free from the trammels of either the doctrine of the law of the case or any consideration of comity in that case.

I shall, therefore, first deal with the suit in which the Baltimore Trust Corporation is plaintiff.

V. The final pledge agreement made by the Baltimore Trust Company was made on March 28, 1932.

It is true that there had been other pledges before June 1, 1931, but on June 1, 1931, the laws of Maryland were amended —Laws of 1931, Chapter 429—so as to give powers to Maryland banks and trust companies, *inter alia* (Italics mine):

"To deposit securities for the purpose of securing deposits of *the United States Government and its agencies,* and the State of Maryland and counties, cities, towns and other political sub-divisions of the State of Maryland, or to secure the surety or sureties on bonds furnished to secure such deposits."

 I think it is beyond peradventure that the Philippine Government must be regarded, before the Independence Act, as an agency of the government of the United States. See in this connection

---

[1] The fact that the name Baldwin does not again occur is because on March 1, 1937, Hardee succeeded him as receiver of Commercial National Bank of Washington.

Domenech v. National City Bank, 294 U. S. 199, 204, 55 S.Ct. 366, 368, 79 L.Ed. 857, and the decision of Posadas v. National City Bank, 296 U.S. 497, 56 S.Ct. 349, 80 L.Ed. 351, assimilating the Philippine Government to the Government of Porto Rico referred to in the Domenech Case.

■ I hold, therefore, that the pledge of March 28, 1932, was valid, and that, whatever its earlier status, the pledge of the bonds of the Baltimore Trust Company was validated by the subsequent Act of Maryland of June 1, 1931. Cf. McNair v. Knott, 302 U.S. 369, 58 S.Ct. 245, 82 L.Ed. 307.

Consequently, it is unnecessary for me to go further than to make the observation that the Maryland Act of June 1, 1931, refers merely to "securing *deposits* of the United States Government and its agencies", and was not limited to "public moneys of the United States."

It seems to me that under a proper construction of the 1931 amendment of the Maryland Banking Law, deposits in the Baltimore Trust Company were legally and properly secured and that the pledges of its assets were valid.

VI. In dealing with the causes here consolidated, it must always be borne in mind—

A. That, whilst there are three parties involved in the situation out of which each of these causes arose, to-wit—(1) a plaintiff, receiver or liquidator, as the case may be, (2) the Commonwealth of the Philippine Islands, and (3) the Chase National Bank—there are only two parties to each of the causes,—the plaintiff receiver or liquidator and the Chase National Bank.

B. That, in so far at least as the matters herein involved are concerned, there was not any substantive legal relationship between any of the plaintiffs and the Chase Bank.

C. That the relationship between the Commonwealth of the Philippine Islands and the Chase Bank was that of depositor and bank of deposit, a relationship in which the Chase Bank was at the debtor or liability end, and the Philippine Commonwealth at the creditor or asset end.

In these causes we are concerned only with choses in action, for the bonds alleged to have been illegally pledged were choses in action, as were the checks given to the Philippine Government or its representatives as payment therefor, and as were also the bank accounts of the Philippine Government with the Chase Bank.

In respect of all these choses in action the Philippine Government was at the creditor end.

Whether, therefore, it was legal, or, as the plaintiffs claim, illegal for the Philippine Government to create these choses in action in its favor with the Chase Bank, that is the situation which we find here when the Chase Bank accepted its deposits, and agreed to become its debtor for the amounts severally involved in these causes.

■ There must be an asset—whether it be land, a chattel or a chose in action—in order to have a trust of any kind, express, implied in fact, or impressed by law.

■ In order to establish a constructive trust of a chose in action, a court must, when suit is brought, have jurisdiction of the party at the *asset* end of the chose in action.

At the time when these suits were brought against the Chase Bank, the Chase Bank, so far as the Philippine Government was concerned, was not at the asset end of any chose in action on which a trust could be imposed. Its sole position was that it owed debts to the Philippine Government represented by fourteen deposit accounts.

■ As it is impossible to make a res out of a liability or to impress a trust thereon, all the plaintiffs' suits must necessarily fail. Cf. Blakey v. Brinson, 286 U.S. 254, 263, 52 S.Ct. 516, 518, 76 L.Ed. 1089, 82 A.L.R. 1288.

It is argued that, in the peculiar circumstances of these causes, the requirement of a res may be relaxed, and that the Chase Bank may be ordered to pay over the moneys it received without regard to the Philippine accounts except as they indicate what sums have already been paid out.

All the cases cited for the necessity of tracing a res, the plaintiffs say, involved insolvency and, hence, the possibility of a preference,—a situation which does not exist here. I cannot accept the proposition that there may be a trust of any kind, express or by operation of law, without a res.

The cases on which the plaintiffs seem principally to have relied proceeded, I think, not on any trust theory, but on the

theory of an action at law for money had and received.

Nevertheless, the flexibility of modern procedure is such as to require me to consider whether that theory can help the plaintiffs, although it has not been mentioned at any point in the argument of these causes, each of which, in essence, seems to me to be an attempt to graft on a legal stem a device for relief available only in equity—in order, I suppose, somehow, if possible, delicately to excise from the deposits of the Philippine Commonwealth in the Chase Bank the part thereof claimed by the plaintiffs, without touching any sensitive nerve of sovereignty.

VII. The basis of constructive trusts, such as the plaintiffs seek, is knowledge of wrongdoing. This knowledge may be inherent in the situation as in cases of constructive trusts imposed on malefactors or it may be based on notice, as where a party has received a res innocently, and, *after* notice, refuses to return it or make restitution for it.

Put at their highest for the plaintiffs, these causes are of the latter kind, and, assuming all the plaintiffs' contentions herein, nothing occurred to make it against conscience for the Philippine Government to take the bonds voluntarily turned over to it as pledges by their owners, or to sell them in due course with the consent of their owners so as to liquidate those pledges, and thereafter to deposit the proceeds of such liquidation in a bank of deposit and to use the proceeds in the ordinary course of its business, until it received notice from the several plaintiffs of their claims for restitution. In causes of this kind it is only retention *after notice* which would constitute a wrong in equity. Adams v. Champion, 294 U.S. 231, 236, 55 S.Ct. 399, 401, 79 L.Ed. 880; Holly v. Missionary Society, 180 U.S. 284, 290, 21 S.Ct. 395, 45 L.Ed. 531.

When all the funds in a deposit have, what perhaps I might conveniently call, a juridical parity,—that is, when they are all free funds or all trust funds—the rule applicable to the drawing out of those funds is that the first put in is presumed to be the first drawn out. Cf. Clayton's Case, 1 Mer. 572, 604, 608; In re A. Bolognesi & Company, 2 Cir., 254 F. 770, 773; Empire State Surety Co. v. Carroll County et al., 8 Cir., 194 F. 593, 605, and Carson v. Federal Reserve Bank, 254 N.Y. 218, 232, 233, 172 N.E. 475, 70 A.L.R. 435, which was cited with approval by the United States Supreme Court in Stockholders v. Sterling, 300 U.S. 175, 184, 57 S.Ct. 386, 390, 81 L.Ed. 586.

It is only when there is a conflict between trust funds and general or free funds of the depositor that the doctrine of In re Hallett's Estate, L.R. 13 Ch.Div. 696, comes into operation and there is a presumption that the guilty depositor has removed his own funds first and left on deposit those funds which are infected by the constructive trust.

The applicability of the rule in Clayton's Case to the moneys paid out of the Philippine Government accounts does not depend on whether these suits be deemed to be at law or in equity. For if these suits be treated as actions for money had and received, instead of suits to impress a trust, it is still true that the Chase Bank cannot possibly be held for any sum paid out before notice of the plaintiffs' claims, and that the "first in, first out theory" should in these circumstances be applied. Carson v. Federal Reserve Bank, 254 N.Y. 218, 232, 172 N.E. 475, 70 A.L.R. 435.

VIII. Assuming that a constructive trust could ever be imposed on the party having the liability end of a chose in action, as the plaintiffs seem to contend, in the instant causes there was not any notice of any kind either to the depositor, the Philippine Commonwealth, which was at the creditor or asset end of the chose in action, or to the bank of deposit, the Chase Bank, which was at the debtor or liability end of the chose in action, on which a constructive trust could be founded under any theory, until the suits were brought by the receivers of the national banks now before me.

At that time, as shown by the evidence, there was not any part of the funds resulting from the pledged bonds left on deposit with the Chase Bank except the sum of $33,733.90, the residue of what had been deposited in the Bradford case.

IX. The last oral argument was concerned, in part at least, with the question whether or not it would be possible for the plaintiffs in the Bradford case to recover this sum of $33,733.90.

I do not think it would be possible because the Philippine Commonwealth is a

sovereign and has immunity with regard to its bank accounts which are in its possession.

■ A. The burden of proving sovereign immunity is necessarily laid on the party who asserts it. The Tampico, D.C., 16 F. 491, where Judge Addison Brown, of this District, said at page 500:

"In claiming exemption from the ordinary process of the court, the burden of proof is clearly upon the claimant to prove, by competent evidence, all the facts necessary to sustain this defense."

■ The touchstone of a successful claim of immunity for any property is that the property is in the possession of the sovereign when the actor in the suit seeks to avail himself of it, whether by way of proceeding in rem, attachment, garnishment or execution.

B. That the Philippine Commonwealth is in possession of its bank accounts with the Chase Bank—if, indeed, it is not common ground—is shown I think in two ways.

In the first place, the Secretary of War, as amicus curiæ, filed a suggestion, which was presented to me by Captain Eugene M. Caffey, of the Judge Advocate General's Department of the United States Army— a member of the Bar of the District of Columbia, admitted pro hac vice for the purpose of these causes to the Bar of this Court—and which, without submitting the Philippine Commonwealth to the jurisdiction of this Court, claimed for it immunity as a sovereign in the following terms:

"Now comes Harry H. Woodring, Secretary of War of the United States of America, and informs and suggests to· this Honorable Court as follows:

"1. That the War Department of the United States, of which your informant is in charge, is the Executive Branch of the Government of the United States having charge, for the United States, of all matters pertaining to the Government of the Commonwealth of the Philippine Islands. That all official communications from the Government of the Common-wealth of the Philippine Islands to the Government of the United States are sent to and are received by the War Department of the United States.

"2. That the Government of the Commonwealth of the Philippine Islands, by its President, Manuel L. Quezon, has rep-resented and claimed to the War Department of the United States that the property in controversy in each of the six suits constituting the above consolidated cause is the balance of a deposit account in the defendant, The Chase National Bank of the City of New York, standing on the books of the defendant to the credit of said Government; that said balance in each said deposit account is the property of said Government; that said property is dedicated to the public purposes of said Government; that the Government of the Commonwealth of the Philippine Islands cannot be sued in this Court without its consent; and that the Government of the Commonwealth of the Philippine Islands claims and will claim immunity from suit herein.

"3. That the Government of the Commonwealth of the Philippine Islands by its said President, has requested the War Department of the United States to cause this suggestion to be made to this Honorable Court.

"4. That the undersigned has examined the bill of complaint in each of the above-named six suits and the answer thereto, and has also considered the aforesaid representation and claim of the Government of the Commonwealth of the Philippine Islands That the undersigned, as the Head of the War Department of the United States, has concluded that said representation and claim of the Government of the Commonwealth of the Philippine Islands are made in good faith and are substantiated by records and documents in the possession of the Bureau of Insular Affairs of the War Department of the United States.

"5. That the Government of the Commonwealth of the Philippine Islands constitutes and is a sovereign state and functions as such, recognizing certain powers reserved to the United States of America for its guidance and protection; that said Government has its own Constitution and body of laws, an Executive Department, headed by a president, a Legislature, a Judiciary, and a complete administrative system; that the Government of the Commonwealth of the Philippine Islands, as a sovereign government, and its property, are entitled to immunity from suit herein in the Courts of the United States.

"Wherefore, the undersigned, the Secretary of War of the United States, has authorized and directed Captain Eugene M.

Caffey, of the Judge Advocate General's Department, to present this suggestion to this Honorable Court, and without appearing for the Government of the Commonwealth of the Philippine Islands or submitting its rights to the jurisdiction of this Court, respectfully suggests that this Court has no jurisdiction of the subject-matter in controversy herein and has no jurisdiction of the Government of the Commonwealth of the Philippine Islands or its property, cannot render any judgment affecting the subject-matter of this consolidated cause or of any of said six suits constituting the same in the absence of said Government, and cannot retain jurisdiction of said Government or its property, even if the said Government be joined as a party defendant herein and be served with the process of this Court, for the reason that said Government is a sovereign entity not subject to the jurisdiction of this Court unless by its consent."

C. A suggestion by Mr. Woodring's predecessor, as Secretary of War, Mr. George H. Dern, in substantially the same form, was presented to Judge Knox on the occasion of the motion to dismiss for lack of an indispensable party referred to above.

Judge Knox did not deal with this suggestion when he made his decision on that motion. Since then the case has moved on and the plaintiffs are now directly at grips with the immunity of sovereignty.

D. The Secretary of War is the officer who now deals with the affairs of the Philippine Commonwealth so far as the United States is concerned therewith, and, prior to the effective date of the Independence Act, November 15, 1935, his predecessors were in charge of the affairs of the Philippine Government for upwards of a generation.

■ I think, therefore, that the Secretary of War is the member of our Executive Department who has the right to make suggestions and representations as to the sovereignty of the Philippine Commonwealth. Duff Development Company, Ltd., v. Government of Kelantan and Crown Agents for the Colonies, Garnishees, [1923] 1 Ch. 385, [1924] A.C. 797.

I do not think that the view which I have expressed is contrary to the principle underlying the recent pronouncement by the United States Supreme Court on the subject of a suggestion by the Executive Department in the case of The Navemar, 303 U.S. 68, 58 S.Ct. 432, 82 L.Ed. 667, decided January 31, 1938, in which Mr. Justice Stone said of the claim of immunity based on possession (page 434) :

"If the claim is recognized and allowed by the Executive Branch of the government, it is then the duty of the courts to release the vessel upon appropriate suggestion by the Attorney General of the United States, or other officer acting under his direction."

The Republic of Spain was involved in The Navemar and, of course, in the case of a foreign sovereign with whom we have diplomatic relations it would be the Secretary of State who would make the suggestion, and he might do it through the Attorney General, as he did in the case of The Attualita, 4 Cir., 238 F. 909. In that case the suggestion failed, not because it was not not made under proper procedure, but because it did not claim *possession* by the Italian Government of the steamship Attualita.

In the present case, it seems to me, for the reasons above stated, not only—as I have already held—that the Secretary of War is the proper person to make the suggestion he has made, but also that he has approached the Court through a proper intermediary,— an officer in his legal department and a member of the bar, and through him has made a suggestion which is wholly adequate and behind which the Court may not go.

■ E. If, however, I am wrong in so dealing with the suggestion of the War Department, I think that I must take judicial notice of the Philippine Independence Act— (Public 127, 73rd Congress), Title 48 United States Code, Sections 1231-1247, 48 U.S. C.A. §§ 1231–1247—providing for the creation of a sovereign state in the Philippine Islands, which though still subject in some respects, such, for example, as foreign relations, to the United States is similar— since the Proclamation of November 14, 1935, 49 Stat. 3481,—in its juridical status to the Government of Kelantan in the case of Duff Development Company, Ltd., v. Government of Kelantan and the Crown Agents for the Colonies, Garnishees, [1923] 1 Ch. 385, [1924] A.C. 797; and compare Porto Rico v. Rosaly, 227 U.S. 270, 273, 33 S.Ct. 352, 57 L.Ed. 507; Kawananakoa v. Polyblank, 205 U.S. 349, 353, 27 S.Ct. 526, 51 L.Ed. 834, and Merritt v. Government of Philippine Islands, 34 Phil. 311, 316.

Thus the status of the Philippine Commonwealth as a sovereign is established without recourse to the suggestion of the Secretary of War.

 F. As to the proof of the fact that its bank accounts with the Chase National Bank are in its possession—if, indeed, that fact is not common ground—I hold it was amply proved by the evidence before me which shows that all the fourteen accounts with the Chase National Bank were in the name of the Treasurer of the Philippine Islands, as will be noted above where I gave them in detail.

 I have had much solicitude in determining this question of possession of the bank accounts, and have come to the conclusion that the best, if not the only, way in which the possession of a chose in action—such as a bank account—can be shown, is by showing in whose name the account stands, for the person in whose name the account stands has absolute control of it and that is all possession of a chose in action can mean.

If the accounts had been in the name, for example, of the head of the Bureau of Insular Affairs, a different situation might have been presented to me.

G. For successfully to maintain a claim of a sovereign for immunity of its property depends, as I have already intimated in this point, on the question of possession by the sovereign, as is shown in the following cases: The Western Maid, The Liberty, and The Carolinian, 257 U.S. 419, 432, 42 S.Ct. 159, 160, 66 L.Ed. 299; The Davis, 10 Wall. 15, 21, 19 L.Ed. 875; The Exchange v. McFaddon, 7 Cranch 116, 3 L.Ed. 287; Dexter & Carpenter, Inc., v. Kunglig Jarnvagsstyrelsen, 2 Cir., 43 F.2d 705, 707, 708; The Attualita, 4 Cir., 238 F. 909; Briggs v. Lifeboat, 7 Allen, Mass., 287; Id., 11 Allen, Mass., 157; The Parlement Belge, L.R. 5 P.D. 197; The Constitution, L.R. 4 P.D. 39.

H. Inasmuch as I hold that the bank accounts of the Philippine Commonwealth, in the name of the Treasurer of the Philippine Islands, were in possession of a sovereign—whether I interfere with that possession by imposing a constructive trust or by an execution on a judgment,—I am interfering with the property of a sovereign in its possession, which I may not do.

It matters not, therefore, in the result which may be reached in these causes whether they are moved over to the law side of the Court or not:

It seems to me that this consideration of possession by a sovereign is decisive of the causes, and that I must hold that the claim of the plaintiffs in the Bradford case —and any claims which any other of the plaintiffs may have on any theory in the other causes—cannot be maintained for this reason—quite aside from the question of whether I could impose a constructive trust on a liability, which seems to me obviously impossible.

Indeed, I think my course is plotted for me by the case of Dexter & Carpenter, Inc., v. Kunglig Jarnvagsstyrelsen, 43 F.2d 705, 707, 708, wherein the Circuit Court of Appeals for this Circuit quoted with approval the case of Duff Development Company, Ltd. v. Government of Kelantan, etc., [1923] 1 Ch. 385, [1924] A.C. 797, and held that funds to the credit of the Swedish Government on deposit in the National City Bank could not have execution levied on them under a judgment at law which had been recovered by Dexter & Carpenter, Inc. in this Court. 300 F. 891.

X. I hold, accordingly, that the private technicality of ultra vires on which the plaintiffs have wholly relied herein, and on which Judge Knox decided the motions to dismiss for failure of parties, cannot override the public technicality of sovereign immunity, which, I believe, has never been more justifiably invoked.

It becomes unnecessary, therefore, for me to discuss the many other interesting questions and cases which were pressed on me in the briefs and in the oral arguments.

XI. The parties have exchanged and submitted proposed findings of fact and conclusions of law. The defendant has also filed a memorandum criticizing the plaintiffs' proposed findings of fact, and the plaintiffs may file, with the Clerk, by July 9th a memorandum criticizing the defendant's proposed findings of fact.

The conclusions of law herein are disposed of by the foregoing opinion.

If, in view thereof, either or both of the parties wish to revise their findings of fact or conclusions of law they may arrange, by writing to the Clerk who will communicate with me, to withdraw those already submitted.

After the findings of fact are settled and signed by me, the defendant must notice, in each of the constituent causes of this consolidated cause, a final decree dismissing the complaint with costs, and with taxable disbursements which are to be allocated equally as against the several plaintiffs.

On Settlement of Findings of Fact and Conclusions of Law.

The findings of fact and conclusions of law submitted by the defendant are approved as amended herein, have been this day signed, and are hereby ordered filed as part of the record herein.

The several findings of fact and conclusions of law, submitted by the attorneys for the plaintiff, have been returned to them direct; for the reason that, in my opinion, only the findings of fact and conclusions of law signed by the trial judge should be filed as part of the record in any cause.

The unsuccessful party must seek its relief, if any, in and by its assignments of error in the event that there is an appeal.